685 A.2d 1267

GERALD DEL TUFO, EXECUTOR OF THE ESTATE OF DONALD KIKEN, PLAINTIFF–APPELLANT, v. TOWNSHIP OF OLD BRIDGE, OLD BRIDGE TOWNSHIP POLICE DEPARTMENT, PATROLMAN THOMAS COLLOW, PATROLMAN ROBERT MAHER, WILLIAM A. VOLKERT, CHIEF OF THE OLD BRIDGE TOWNSHIP POLICE DEPARTMENT AND JERRY PA-LUMBO, ACTING CHIEF OF POLICE OF OLD BRIDGE TOWN-SHIP POLICE DEPARTMENT AND JOHN DOES (1 THROUGH 5), DEFENDANTS–RESPONDENTS.

Argued November 27, 1995—Decided December 12, 1996.

92

*Richard Galex* argued the cause for appellant (*Galex, Tortoreti & Tomes,* attorneys).

*James B. Moran* argued the cause for respondents (*Hoagland, Longo, Moran, Dunst & Doukas,* attorneys).

The opinion of the Court was delivered by

COLEMAN, Judge.

The question presented in this wrongful death case is whether comparative negligence is available as a defense to a wrongful death claim alleging police negligence in failing to provide immediate medical care to an arrestee who, unbeknownst to the police, had taken a lethal drug overdose shortly before his arrest. The trial court declined to provide a comparative negligence instruction, and the jury returned a verdict for the plaintiff. The Appellate Division reversed in a reported decision, concluding that the jury should have been instructed to weigh decedent's negligence against the police's negligent failure to summon immediate medical assistance. *Del Tufo v. Township of Old Bridge*, 278 *N.J.Super.* 312, 322, 650 *A.*2d 1044 (App.Div.1995).

We granted certification, 140 *N.J.* 328, 658 *A.*2d 728 (1995), and now affirm.

*I*

On August 10, 1986, at 10:58 p.m., the Old Bridge Township Police Department received notice of a vehicular accident in a residential complex in Old Bridge. Officers Thomas Collow and Robert Maher arrived at the scene at 11:04 p.m. in separate patrol cars. A group of people had congregated around the accident site. Several damaged vehicles, which appeared to have been parked at the time of impact, lined the roadway.

A white Cadillac, also damaged, was situated partially on the sidewalk and partially on a lawn. The decedent, Donald Kiken, was sitting at the wheel of the Cadillac with its engine running. Officer Collow approached and told Kiken that the police had arrived and that everything was under control and instructed Kiken to shut off the Cadillac's engine. Suddenly Kiken backed the vehicle off the sidewalk, striking both Collow and Maher and knocking them to the ground. Kiken continued to drive in reverse up to the top of the street. Collow pursued on foot but lost sight of the Cadillac.

The officers split up to search for Kiken. Within a few minutes, Maher located the Cadillac in the driveway of Kiken's nearby residence where Kiken had driven the car into his closed garage door. Maher approached and asked Kiken if he was all right. Kiken responded, "Yes, I'm fine. I did nothing wrong. I did nothing wrong." Maher noticed a one-eighth inch laceration on the bridge of Kiken's nose, which he presumed was caused by the motor vehicle accident. Officer Maher asked Kiken to exit the vehicle and Kiken complied.

As Kiken was exiting his vehicle, Sergeant Crowley, the Patrol Supervisor, arrived at the scene. Sergeant Crowley asked Kiken if he needed medical attention, to which Kiken responded, "No, sir." Sergeant Crowley and Officer Maher placed Kiken under arrest presumably for striking the officers with the Cadillac. As a result of the arrest, Kiken became excited and a minor struggle ensued as the police handcuffed Kiken. At 11:09 p.m. Officer Maher radioed headquarters to report that the arrest was completed. Pursuant to Sergeant Crowley's directions, Officer Maher then placed Kiken in the back seat of the patrol car.

After Kiken was placed into the patrol car, Officer Collow observed Kiken turn his body and kick the rear side windows of the patrol car. Officer Maher also observed Kiken kick the back window. Sergeant Crowley heard a "thumping" noise coming from the back seat of the patrol car but did not observe what was causing it. A nearby neighbor testified that he observed Kiken "undulating" in the back seat, "vigorously shaking" his body without uttering a sound and causing the patrol car to move back and forth.

Pursuant to Sergeant Crowley's direction, Officer Maher left the scene at 11:20 p.m. and transported Kiken to police headquarters. Upon arriving at headquarters, Lieutenant Stenger and Patrolman Nobel assisted Officer Maher in removing Kiken from the patrol car. Kiken began walking, stopped as if he was about to fall, then regained his footing and continued. After taking a few more steps with the assistance of the police officers, Kiken stepped on his own

feet and collapsed. The officers removed the handcuffs and transported Kiken to the cell area. One officer administered cardiopulmonary resuscitation (CPR) and another radioed for first aid. The Cheesequake First Aid Squad received that call at 11:29 p.m. An ambulance arrived at the station at 11:36 p.m. and transported Kiken to Old Bridge Regional Hospital. Kiken died in the hospital at 12:03 a.m. of cardiac failure. According to plaintiff's expert, the cause of the cardiac failure was an overdose of between one and one-half and three and one-half grams of cocaine, an amount well in excess of a lethal dosage. According to medical testimony, the intake of cocaine occurred through a combination of snorting and swallowing probably within an hour of death, which was the approximate time of the accident.

## II

The executor of decedent's estate filed a wrongful death action pursuant to *N.J.S.A.* 2A:31–1 to –6 against individual police officers, the police department, and the Township of Old Bridge, alleging negligence on the part of the police in failing to summon emergency medical assistance upon decedent's arrest. Plaintiff's expert on police procedures testified that the arresting officers should have recognized from decedent's behavior in the police car and the surrounding circumstances, that decedent was in need of medical assistance from the time of the arrest and should have summoned medical assistance immediately.

According to plaintiff's medical expert, the fact that decedent was involved in a motor vehicle accident and had sustained an injury to his nose indicated that he was in need of medical assistance. The expert further stated that the undulating motions decedent made in the patrol car were probably symptoms of a seizure. Plaintiff's expert concluded that decedent would have had a seventy-five percent chance of survival if assistance had been summoned at 11:09 p.m. and if Kiken had reached the hospital by 11:35 p.m. Further, Kiken would have had a fifty percent chance of survival if assistance had been summoned at

11:20, when the order was given to transport decedent to police headquarters, and if Kiken had arrived at the hospital at 11:40 p.m.

According to the defendants' expert on police procedure, nothing in decedent's behavior or the surrounding circumstances indicated to the arresting officers or to Sergeant Crowley that decedent was in need of immediate medical assistance. The expert further stated that decedent's act of kicking the patrol car windows was not unusual and could be understood as an expression of his anger or remorse. The expert expressed the view that given decedent's conscious reply that he did not need medical assistance and the absence of any obvious critical injury, the actions of the officers and the sergeant in arresting and transporting decedent to headquarters were normal and appropriate. Defendants did not call a medical expert.

At the conclusion of the presentation of evidence, defendants sought an instruction on comparative fault that would require the jury to consider whether the decedent was negligent in: (1) ingesting cocaine; (2) failing to inform the police that he had ingested a lethal amount of cocaine; and (3) telling the police that he did not need medical assistance. The trial court relied essentially on *Dubak v. Burdette Tomlin Memorial Hospital,* 233 *N.J.Super.* 441, 559 *A.*2d 424 (App.Div.), *certif. denied,* 117 *N.J.* 48, 563 *A.*2d 817 (1989), and rejected the request for a comparative negligence charge.

On the issue of causation, the court charged both the standard "but for" proximate cause as well as the "substantial factor" standard without any instruction on apportionment of damages. The jury was instructed:

> Now, what do we mean by proximate cause? Proximate cause is generally defined as any cause which in the natural and continuous sequence of events unbroken by any efficient intervening cause produces the result complained of and without which the result would not have occurred. Stated differently, plaintiff must show that the defendants' conduct constituted a cause in fact of decedent's death because of an act or omission. And an act or omission is not regarded as a cause of the event, but the event would have occurred without such act or omission.

Liability may be imposed upon the defendants after showing that the negligent conduct was a substantial factor in causing the death.

Now, in order for the plaintiff to prove causation, plaintiff must show that the defendant police officers' negligent conduct negated a substantial possibility that prompt rescue efforts would have been successful thereby constituting a substantial factor in causing the decedent's death. That is, Mr. Kiken's death.

So defendants can be held liable if it's been shown to your satisfaction that one or more of the officers was negligent in failing to provide medical care. And that within a reasonable degree of medical probability delay in providing medical attention to Donald Kiken increased the risk of harm to him. And that such increased risk was a substantial factor in producing the resultant death. If there was any substantial possibility of survival and defendants have destroyed it, then they are answerable.

Now, rarely is it possible to demonstrate to an absolute certainty that—what would have happened in the circumstances that the wrongdoer did not allow to come to pass. And the law does not require plaintiff to show to a certainty that Donald Kiken would have lived had he been hospitalized and treated properly. Rather, what is—I repeat, what has to be shown is that the delay in providing medical attention to Donald Kiken was a substantial contributing factor to his death.

When the trial court rejected the request for a comparative negligence charge, the court apparently concluded that its causation instructions made a comparative negligence charge superfluous. It stated that the proximate cause issue required the jury to consider Kiken's ingestion of cocaine

because the question is whether it was a substantial contributing factor. And if—if weighing the ingestion of cocaine and how far in the rest of his body they find it progressed in his body, they find the fact that the police may not have responded in time or not have given him medical attention is not a substantial contributing factor because of the operation of the cocaine in his body. I think that's met.

The court submitted six questions to the jury. It asked whether each of the officers, Maher, Collow, and Crowley, was negligent in failing to summon prompt medical assistance and whether the negligence of each was a substantial contributing factor in causing Kiken's death. The jury found that Officers Maher and Collow were not negligent. The jury also found that Sergeant Crowley was negligent in failing to summon medical assistance promptly and that his negligence was a substantial contributing factor in causing Kiken's death. The jury awarded $300,000 in damages.

### III

Plaintiff argues that any fault on the part of Kiken in ingesting cocaine, not informing the police of his condition, or in telling the police that he did not need medical assistance, should be considered only on the issue of mitigation of damages rather than on the issue of comparative liability. He relies on *Hake v. Manchester Township*, 98 *N.J.* 302, 486 *A.*2d 836 (1985), and a series of cases involving health care providers ending with *Tobia v. Cooper Hospital University Medical Center*, 136 *N.J.* 335, 643 *A.*2d 1 (1994).

Defendants respond that the Appellate Division properly concluded that comparative negligence should control the liability issue. They agree with the court below that "[a]lthough the police had the duty to attempt to protect [Kiken] from the physical consequences of his overdose if they knew or should have known of his condition, [the health care provider cases do not control because Kiken] was not placed in their protective care because of" his ingestion of cocaine. *Del Tufo, supra*, 278 *N.J.Super.* at 321, 650 *A.*2d 1044. According to defendants, "Mr. Kiken had the capacity to exercise reasonable self-care." *Ibid.* Defendants argue that *Lee v. Kiku Restaurant*, 127 *N.J.* 170, 603 *A.*2d 503 (1992), not the health care cases, should control.

### -A-

It is beyond dispute, and defendants have conceded as much, that defendants have a duty to provide emergent medical assistance for an arrestee or an inmate in the custody of a law enforcement agency. We find such a duty exists. *Revere v. Massachusetts Gen. Hosp.*, 463 *U.S.* 239, 103 *S.Ct.* 2979, 77 *L.Ed.*2d 605 (1983); *Estelle v. Gamble*, 429 *U.S.* 97, 97 *S.Ct.* 285, 50 *L.Ed.*2d 251 (1976); *Saint Barnabas Medical Ctr. v. Essex County*, 111 *N.J.* 67, 74, 543 *A.*2d 34 (1988). "[D]eliberate indifference to serious medical needs of prisoners [and arrestees] constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle, supra*, 429 *U.S.* at

104, 97 *S.Ct.* at 291, 50 *L.Ed.*2d at 260 (citations omitted) (quoting *Gregg v. Georgia,* 428 *U.S.* 153, 173, 96 *S.Ct.* 2909, 2925, 49 *L.Ed.*2d 859, 875 (1976)). The police's duty of care to an arrestee requires the exercise of reasonable care to preserve the life, health, and safety of the person in custody.

■ Knowledge on the part of the custodian that the arrestee is in need of emergent medical assistance is an important factor to be considered by a factfinder in determining whether the custodian exercised reasonable care. A plaintiff must establish that there was an indifference to serious known medical needs.

■ Common sense dictates that a police officer is not obligated to seek medical treatment for every arrestee involved in an automobile accident. A routine question on an accident report form is whether anyone involved in the accident needs medical assistance. Here, Officer Maher observed Kiken seated in the Cadillac in his driveway with a laceration on his nose and asked whether he was all right. Kiken responded, "Yes, I'm fine." Before being placed in handcuffs, Kiken was asked if he needed medical attention to which he responded, "No sir." If the testimony of the police officers is found to be credible, it is clear that up to that point, approximately 11:09 p.m., the police officers acted reasonably in not seeking medical assistance for Kiken. At no time did Kiken inform the police personnel that he needed medical assistance for a drug overdose or for his injuries sustained in the accident.

-B-

The trial court relied on *Dubak v. Burdette Tomlin Memorial Hospital, supra,* in submitting the case to the jury under both the standard proximate cause charge and the "substantial factor" causation theory. *Dubak* involved a decedent who was injured in a barroom brawl that extended into a parking lot. *Dubak, supra,* 233 *N.J.Super.* at 445–46, 559 *A.*2d 424. As soon as a Wildwood police officer arrived at the parking lot, the decedent collapsed.

*Id.* at 446, 559 *A.*2d 424. An ambulance was summoned, and it arrived within minutes. *Ibid.* The decedent was transported first to the Wildwood Clinic and then, after a brief stop, to defendant hospital, where he lost consciousness upon arrival. *Id.* at 446–47, 559 *A.*2d 424. The decedent was taken to the operating room two and three-quarter hours after his arrival at the emergency room. *Id.* at 447, 559 *A.*2d 424. He died fifty minutes later in the operating room from massive abdominal hemorrhaging, laceration of the liver, and contusion of the pancreas. *Ibid.*

The plaintiff instituted a medical malpractice action, claiming that surgery should have been performed sooner and that the failure to do so constituted a substantial factor in causing the decedent's death. *Id.* at 444, 448, 559 *A.*2d 424. The parking lot in which the brawl was continued was owned by the "Q" Lounge. *Id.* at 446, 559 *A.*2d 424. A separate complaint was filed against the "Q" Lounge alleging that it failed to provide adequate security for its patrons. *Id.* at 444, 559 *A.*2d 424. No claim was made against the police officer.

Separate liability trials were conducted because the decedent's contributory negligence could not be used as a defense in the medical malpractice case. *Ibid.* In the medical malpractice case, the jury found the surgeon ten percent at fault, the assailant seventy percent at fault, and the lounge twenty percent at fault. *Id.* at 445, 559 *A.*2d 424. In the action against the lounge, another jury found the assailant sixty percent at fault, the lounge twenty percent at fault, and the decedent ten percent at fault.[1] *Ibid.* Under those circumstances, the Appellate Division approved the use of the standard proximate cause charge for the first trial and the *Scafidi v. Seiler,* 119 *N.J.* 93, 108–09, 574 *A.*2d 398 (1990), enhanced risk causation charge in the medical malpractice case. *Dubak, supra,* 233 *N.J.Super.* at 450–51, 559 *A.*2d 424. Significantly, the court also acknowledged that in a non-medical malprac-

---

[1] The opinion does not explain why the total fault of all the parties was less than 100%.

tice case "a plaintiff's conduct antecedent to the defendant's alleged negligent act can have a bearing on the issue of comparative fault to the extent that it contributed to the cause of the incident or to the extent of the injuries sustained." *Id.* at 461, 559 A.2d 424.

In the present case, however, the Appellate Division found that *Fisch v. Bellshot,* 135 *N.J.* 374, 640 A.2d 801 (1994), and *Lee v. Kiku Restaurant,* 127 *N.J.* 170, 603 A.2d 503 (1992), in which comparative negligence was applied in dram-shop settings, should have been applied by the trial court rather than the "substantial factor" or enhanced risk causation.

In *Lee v. Kiku Restaurant, supra,* the Court applied comparative fault in a passenger's action against a tavern for serving alcohol to the passenger's intoxicated driver. *Lee, supra,* 127 *N.J.* at 172, 183, 603 A.2d 503. The defendant tavern served both the plaintiff and his driver after they had become visibly intoxicated. *Id.* at 173, 603 A.2d 503. In assessing the tavern's liability for injuries sustained by the patron-passenger in a subsequent car accident, the Court concluded that the jury should have considered the passenger's fault in drinking to the point of intoxication. *Id.* at 183, 603 A.2d 503. The Court held that absent special circumstances, a visibly intoxicated patron is presumed to be incapable of recognizing the risks associated with his or her conduct. *Id.* at 184, 603 A.2d 503. The Court found, however, that the same patron could not be excused from responsibility for the voluntary and sober decision to consume alcohol up to the point of intoxication. *Ibid.*

Thus, the *Lee* Court held that a tavern's duty toward a visibly intoxicated patron could not defeat the patron's own negligence in initially choosing to drink. In so doing, the Court distinguished *Cowan v. Doering,* 111 *N.J.* 451, 545 A.2d 159 (1988), and similar cases in which the plaintiffs were known to be uniquely incapable of exercising self-care. *Lee, supra,* 127 *N.J.* at 184–85, 603 A.2d 503; *see also Blazovic v. Andrich,* 124 *N.J.* 90, 111–12, 590 A.2d 222 (1991) (holding that the negligence of one party should be

compared with the intentional fault of another party in substantially the same way as though both parties were negligent). Where dram-shop liability is concerned, a patron's negligence may be considered until the patron becomes unable to appreciate the risks of his or her behavior and the tavern becomes aware of that inability by virtue of the patron's visible intoxication. *Lee, supra,* 127 *N.J.* at 186–87, 603 *A.*2d 503. "If a tavern serves alcohol to a visibly-intoxicated patron, a court will ordinarily presume the patron's lack of capacity to evaluate the ensuing risks." *Id.* at 184, 603 *A.*2d 503.

In *Fisch v. Bellshot, supra,* 135 *N.J.* at 390–91, 640 *A.*2d 801, the Court declined to apply the *Lee* presumption of incapacity due to exceptional circumstances. The plaintiff decedent in *Fisch* was a bartender at a tavern owned by the defendant. *Id.* at 378, 640 *A.*2d 801. After working from 11:00 a.m. to 10:30 p.m., she attempted to drive herself home and was killed in a single car accident. *Ibid.* An autopsy revealed her blood alcohol content was .20. *Id.* at 378–79, 640 *A.*2d 801. The jury found that the defendant served decedent while she was visibly intoxicated, and it ascribed twenty-five percent of the fault to defendant. *Id.* at 381, 640 *A.*2d 801. The jury also found decedent was contributorily negligent and ascribed seventy-five percent negligence. *Ibid.* The Appellate Division affirmed the dismissal of the complaint. *Ibid.*

In considering the interaction between the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act (Dram–Shop Act), *N.J.S.A.* 2A:22A–1 to –7, and the New Jersey Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3, the Court found that the Dram–Shop Act intended to incorporate comparative negligence principles. That legislation was amended in direct response to the Governor's conditional veto message to limit a licensee's liability " 'by applying comparative negligence principles where the injured party had the capacity to engage in self-protective measures.' " *Fisch, supra,* 135 *N.J.* at 386, 640 *A.*2d 801 (quoting *Governor's Veto Message to Assembly Bill Nos. 2264, 2209, 2211, 1876, 1679, 865, & 554* (Jan. 22, 1987)). The Court further found

that the exceptional circumstances militating against applying the *Lee* presumption were twofold. The Court noted first, that the decedent served herself, and second, that she did so despite her obligation not to drink while on duty and her knowledge of the progressive nature of intoxication and how debilitating it becomes. *Id.* at 390–91, 640 *A.*2d 801. The Court held that those circumstances warranted application of the standard articulated in *Buckley v. Estate of Pirolo*, 101 *N.J.* 68, 78–79, 500 *A.*2d 703 (1985), under which the jury is instructed to consider the plaintiff's ability to appreciate the risk of engaging in the activity that led to the injury. *Fisch, supra*, 135 *N.J.* at 390, 640 *A.*2d 801. Thus where exceptional circumstances exist, the *Lee* presumption disappears. *Fisch, supra*, 135 *N.J.* at 391–92, 640 *A.*2d 801; *Lee, supra*, 127 *N.J.* at 184, 603 *A.*2d 503.

-C-

The health care cases relied on by plaintiff have not permitted the defense of comparative negligence to reduce a health care provider's fault when the plaintiff's duty of self-care is itself encompassed by the duty of care owed to him or her by the health care provider.

In *Ostrowski v. Azzara*, 111 *N.J.* 429, 545 *A.*2d 148 (1988), the plaintiff, a heavy smoker and an insulin-dependent diabetic, consulted with the defendant, a doctor of podiatric medicine. *Id.* at 432, 545 *A.*2d 148. The defendant removed the plaintiff's left big toenail. *Id.* at 434, 545 *A.*2d 148. Because of peripheral vascular disease that involved the big toe, the plaintiff had to undergo immediate bypass surgery to prevent the loss of the extremity due to a pre-gangrenous condition of the big toe. *Id.* at 435, 545 *A.*2d 148. The plaintiff sued the podiatrist, claiming that she should not have removed the toenail before obtaining vascular tests to determine whether the blood flow was sufficient to heal the surgical wound resulting from removal of the toenail. *Ibid.* The trial court permitted the plaintiff's pre-treatment health habits such as smoking and failing to maintain her weight, diet, and blood sugar at

acceptable levels to be considered by the jury in determining whether the plaintiff was comparatively negligent. *Ibid.* The jury found the plaintiff fifty-one percent at fault and her complaint was dismissed. *Id.* at 436, 545 *A.*2d 148. The Appellate Division affirmed. *Ibid.*

This Court acknowledged that health care providers have a special duty "to protect patients against their own self-destructive acts." *Id.* at 440, 545 *A.*2d 148. That conclusion reflects the policy judgment "that health care professionals have a special responsibility with respect to diseased patients." *Id.* at 444, 545 *A.*2d 148; *see also Procanik v. Cillo*, 97 *N.J.* 339, 348–52, 478 *A.*2d 755 (1984) (finding that although infant plaintiff's condition resulted from pre-existing congenital infection, doctors had duty to prevent that harm by providing parents with the choice to terminate pregnancy). Once a patient comes under a physician's care, however, "the law can justly expect the patient to cooperate with the health care provider in their mutual interests." *Ostrowski, supra,* 111 *N.J.* at 445, 545 *A.*2d 148. The Court held that a health care provider is entitled to have the damages mitigated under the avoidable consequences doctrine based on the patient's post-treatment self-destructive conduct that was a significant cause of the increased damages. *Id.* at 445–47, 545 *A.*2d 148.

Although the health care provider in *Ostrowski* was not permitted to raise a comparative negligence defense based on the plaintiff's cigarette smoking, the manufacturers of cigarettes are permitted to raise that defense. *Cipollone v. Liggett Group, Inc.,* 893 *F.*2d 541, 572–73 (3d Cir.1990), *aff'd in part, rev'd in part,* 505 *U.S.* 504, 112 *S.Ct.* 2608, 120 *L.Ed.*2d 407 (1992); *see also Fiore v. Consolidated Freightways,* 140 *N.J.* 452, 471–73, 659 *A.*2d 436 (1995) (indicating a person may not recover workers' compensation benefits for a heart attack if smoking was the predominate cause). Allowing cigarette manufacturers and employers to raise a comparative fault defense is an acknowledgment of a duty of care in matters related to health.

In *Cowan v. Doering, supra,* 111 *N.J.* at 453, 545 *A.*2d 159, a mentally disturbed patient who jumped from a hospital window sued her doctor and nurses for negligent failure to protect her from injuring herself. The Court held that the defendants could not assert comparative negligence as a defense. *Id.* at 468, 545 *A.*2d 159. The Court did not hold that mental illness necessarily eliminates consideration of comparative negligence. Rather, it stated that the governing "proposition of law ... excuses a plaintiff from exercising reasonable self-care *only* when that duty is itself encompassed by the duty of care owed by the defendant to the plaintiff." *Id.* at 460, 545 *A.*2d 159 (emphasis added). When "health-care professionals ... have undertaken to prevent a patient from engaging in suicidal or self-harmful acts, ... courts have rejected a charge of contributory negligence to determine liability for the injuries caused by such self-damaging conduct." *Id.* at 462–63, 545 *A.*2d 159. Contributory negligence is rejected under those circumstances because the defendant's duty cannot be diluted by the self-damaging conduct of the patient.

In *Tobia v. Cooper Hospital University Medical Center, supra,* 136 *N.J.* at 339, 643 *A.*2d 1, an elderly plaintiff injured herself while trying to slide off a hospital stretcher. The plaintiff was left unattended on an unlocked stretcher with its rails down and fell to the floor while attempting to get off. *Ibid.* The Court held that the health care provider defendants could not assert comparative negligence as a defense to liability because of the defendants' duty to prevent plaintiff from engaging in the self-damaging conduct. *Id.* at 342–43, 643 *A.*2d 1.

In the present case, plaintiff's reliance on *Ostrowski, Cowan,* and *Tobia* is misplaced. Those cases hold that when the duty of a professional health care provider encompasses the protection of a patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the patient. In those cases, the harm was self-inflicted *after* the patient came under the care of the health care provider. Furthermore, we reject the dicta in *Tobia* that placed drug

abusers in the same category as the elderly or mentally ill for purposes of determining whether comparative fault should be available· as a defense when a defendant had a duty to prevent a plaintiff from engaging in self-damaging conduct. *See Tobia, supra,* 136 *N.J.* at 338, 341, 643 *A.*2d 1. Old age, the issue in *Tobia,* "is not the same as drug abuse or mental derangement." *Id.* at 349, 643 *A.*2d 1 (Pollock, J., dissenting).

## -D-

We are also persuaded that the duty to rescue cases do not support plaintiff's position. *Hake v. Manchester Township, supra,* 98 *N.J.* at 304, 486 *A.*2d 836, involved a claim for damages based on the police's failure to provide prompt emergency rescue efforts. The plaintiffs alleged that police officers contributed to the suicide death of their seventeen-year old son at police · headquarters following his arrest for driving while intoxicated. *Ibid.* A police officer found decedent unconscious, without a discernible pulse in a seated position on the floor, with his belt looped around his neck and secured to a bar on a cell door. *Id.* at 308, 486 *A.*2d 836. The police rendered no emergency assistance; nor did they summon an ambulance. *Id.* at 309, 486 *A.*2d 836. Proffered evidence indicated that there was a possibility of reviving decedent through prompt administration of CPR. *Id.* at 312–13, 486 *A.*2d 836. This Court rejected the argument that decedent's representative could not prevail without expert medical testimony that emergency first-aid treatment would probably have saved the decedent's life. *Id.* at 306, 486 *A.*2d 836. The Court held that "in establishing causation it suffices for plaintiffs to show that defendants' negligent conduct negated a substantial possibility that prompt rescue efforts would have been successful, thereby constituting a substantial factor in causing decedent's death." *Ibid.*

*Battista v. Olson,* 213 *N.J.Super.* 137, 516 *A.*2d 1117 (App.Div. 1986), also involved a claim of police failure to provide prompt emergency rescue efforts. *Id.* at 139, 516 *A.*2d 1117. Defendant Officer Olson was at the home of Nicholas Battista when he

received two calls for emergency assistance from Battista's mother who reported that Battista was intoxicated and had ingested drugs. *Id.* at 142, 148, 516 *A.*2d 1117. Olson failed to summon medical assistance despite his knowledge of Battista's perilous condition. *Id.* at 139, 516 *A.*2d 1117. Battista died of respiratory arrest. *Id.* at 147, 516 *A.*2d 1117. A jury found that Olson was fifty percent negligent, his employer the Borough of Leonia was thirty-three percent negligent, and a second police officer was seventeen percent negligent. *Id.* at 140, 516 *A.*2d 1117.

Although the reported decision does not reveal whether any alleged fault against Battista was presented to the jury, Olson claimed on appeal that the issue of compensatory damages should not have been submitted to the jury. *Id.* at 147, 516 *A.*2d 1117. Olson contended that the plaintiff's inability to establish what Battista's condition would have been had proper emergency efforts been made precluded a finding that Olson's "conduct was a substantial factor contributing to Battista's death." *Id.* at 148, 516 *A.*2d 1117. The Appellate Division, relying on *Hake, supra,* concluded that the evidence was sufficient for the jury to have found that Olson's acts of omission " 'negated a substantial possibility that prompt rescue efforts would have been successful, thereby constituting a substantial factor in causing decedent's death.' " *Battista, supra,* 213 *N.J.Super.* at 151, 516 *A.*2d 1117 (quoting *Hake, supra,* 98 *N.J.* at 306, 486 *A.*2d 836).

In *Hake,* the Court reached its holding by analogizing to cases involving allegations of failure to rescue a drowning seaman. *Hake, supra,* 98 *N.J.* at 310–11, 486 *A.*2d 836. In failure to rescue cases "the concepts of causation and duty are intertwined." *Olah v. Slobodian,* 119 *N.J.* 119, 131, 574 *A.*2d 411 (1990). "In such cases, '[t]he duty arises when there is a reasonable possibility of rescue.' " *Ibid.* (alteration in original). Accordingly, *Hake* 's "substantial possibility" standard for rescue-type cases defines both duty and causation.

Implicit in the failure to rescue analogy is the fact that the master of the vessel had full knowledge that a seaman was missing

and presumed to be in the water. Thus the duty to rescue proceeds from the premise that the master of the ship has knowledge that the seaman is in danger of drowning and that knowledge imposes on him or her "a positive duty to make a sincere attempt at rescue." *Gardner v. National Bulk Carriers, Inc.*, 310 *F.*2d 284, 287 (4th Cir.1962), *cert. denied*, 372 *U.S.* 913, 83 *S.Ct.* 728, 9 *L.Ed.*2d 721 (1963). "The duty arises when there is a reasonable possibility of rescue." *Ibid.*

■ In the typical rescue case, the conduct of the person to be rescued after being placed in danger plays no role in determining whether a reasonable possibility of rescue exists. Knowledge by the rescuer in *Gardner* that the seaman had been in the water for hours and knowledge by the police officers in *Hake* that the decedent had hung himself precluded any consideration of either victim's conduct after creating the need to be rescued. In the present case whether a reasonable opportunity existed for the police to satisfy their legal duty depends · on when the police officers knew or should have known that Kiken was in need of medical assistance. That determination requires examination of all the facts, including Kiken's conduct between the time the police arrived ,at the scene and the time at which he could no longer appreciate the risk of his behavior.

-E-

■ Unlike *Hake* and other cases, this is not a causation or lost chance case. The line of cases that limit a plaintiff's fault to mitigation of damages are rooted in the fact that the plaintiff's negligence did not contribute to the accident or the episode that caused the harm. There was evidence that when Kiken was taken into police custody for assaulting police officers with his automobile, he was capable of exercising care for his own safety at that time and thereafter. Thus for at least a portion of the time that defendants are alleged to have been negligent, one version of the evidence indicates that Kiken was capable of informing one or more police officers that he needed medical assistance for a drug

overdose. Viewed in that context, a jury could reasonably find that Kiken's failure to inform the police contributed to the tortious conduct alleged against the defendants. Unless public policy dictates otherwise, whenever a plaintiff's conduct contributes to an event negligently caused by a defendant, the plaintiff's comparative fault should be submitted to the factfinder for determination.

We emphasize that this case is unlike the health care cases that involve negligence of health care providers and the plaintiffs' subsequent indifference towards good health. Rather, this case involves Kiken's volitional and self-destructive criminal act of ingesting a lethal overdose of cocaine, followed by allegedly withholding from the police vital information that would have assisted them in providing immediate medical care. Another distinguishing feature of the health care provider cases is that the harm was self-inflicted after the patient came under the care of a professional. In contrast, the self-inflicted harm in the present case occurred *before* Kiken came into police custody and was exacerbated while he was in custody by his alleged failure to inform the police of the overdose.

Furthermore, a health care provider's superior knowledge and a patient's justifiable reliance on that knowledge provide substantial policy reasons for limiting the applicability of the defense of contributory negligence in medical malpractice cases. *See* Madelynn R. Orr, *Defense of Patient's Contribution to Fault in Medical Malpractice Actions,* 25 *Creighton L.Rev.* 665, 677 (1992). The regulation of health care providers as part of our public policy has heightened societal expectations of health care providers in a manner that distinguishes them from the police in police-arrestee relationships.

■ Accordingly, we hold that this case is not controlled by either the health care cases or the *Hake* rescue rationale. As the Appellate Division observed, Kiken had the capacity to exercise reasonable self-care. *Del Tufo, supra,* 278 *N.J.Super.* at 321, 650 *A.*2d 1044. Unlike the seaman lost at sea or the patient under the care of a health care provider whose duty encompasses protecting

the patient from self-inflicted harm, Kiken's duty of self-care was not subsumed by the duty of care owed him by defendants. *Id.* at 322, 650 *A.*2d 1044. His duty of self-care continued until he no longer possessed the capacity to engage in self-care measures.

## IV

Next, we address the principles that inform our decision to permit the comparative negligence defenses.

### -A-

The defense of contributory negligence urged in this case is two dimensional. First, it focuses on the voluntary ingestion of cocaine. That claim can be characterized as an assumption of the risk type of contributory negligence. Second, it is based on an alleged duty on the part of Kiken to have informed the police that he needed emergent medical assistance because he had ingested a large amount of cocaine.

The assumption of the risk theory "contemplates that one with knowledge of a risk, or facts sufficient to put a reasonably prudent person on notice of risk, must exercise the degree of care that the risk requires." *Doherty v. Trenton Trust Co.,* 42 *N.J.Super.* 398, 403, 126 *A.*2d 899 (1956); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 486–92 (5th ed.1984) (explaining assumption of risk requires knowledge of risk and voluntariness).

The assumption of the risk defense has been divided into two categories. Under a primary assumption of the risk approach, a plaintiff is barred from recovery because he or she is said to have relieved the defendant of any duty to protect the plaintiff or because no duty existed. *Meistrich v. Casino Arena Attractions, Inc.,* 31 *N.J.* 44, 48–49, 155 *A.*2d 90 (1959). The primary assumption of the risk defense has the same operative effect as a finding of as little as one percent contributory negligence before enactment of our Comparative Negligence Act—it is a complete bar to

recovery. This form of assumption of the risk defense is not involved in this case.

The second form of assumption of the risk defense, the so-called secondary kind, is in the nature of contributory negligence in the context of our Comparative Negligence Act. In this case, it does not purport to relieve the defendants of a duty of care. *Meistrich, supra,* 31 *N.J.* at 49, 155 *A.*2d 90; *see also* Keeton et al., *supra,* at 485 (explaining where a plaintiff voluntarily encounters a known danger he or she is not necessarily always consenting to any future negligence of the defendant). It assumes a duty on the part of a defendant and also recognizes a duty of self-care by plaintiff. It is used in the present case as an affirmative defense of comparative negligence based on Kiken's voluntarily encountering a known danger by ingesting a large amount of cocaine. Although we have used assumption of the risk concepts to distinguish between the two comparative fault defenses, the terminology of assumption of the risk should not be used when instructing a jury.

-B-

The conceded positive duty that requires a police officer to make a sincere attempt to save the life of an arrestee in the custody of the police is based in part on fairness and public policy. "The assessment of fairness and policy 'involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" *Carvalho v. Toll Bros.,* 143 *N.J.* 565, 573, 675 *A.*2d 209 (1996) (quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (citing *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962))). Similarly, "foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care." *Carvalho, supra,* 143 *N.J.* at 572, 675 *A.*2d 209.

■■■■■ An examination of the legal principles that should govern the apportionment of fault between law enforcement officials and arrestees who become ill while in police custody from the ingestion of illegal drugs, should reflect the strong public policy of this State to make such arrestees legally accountable for violating the New Jersey Comprehensive Drug Reform Act, *N.J.S.A.* 2C:35–1 to –23. The Legislature has recognized that "the unlawful use ... of controlled dangerous substances continues to pose a serious and pervasive threat to the health, safety and welfare of the citizens of this State." *N.J.S.A.* 2C:35–1.1b. Consistent with this strong public policy, we believe a person who overdoses on a controlled dangerous substance before coming into police custody should have the same responsibility for self-care as that required of a dram-shop patron. After all, a sound public policy justification is largely a matter of what is fair, which includes considerations of who is best able to prevent the creation of the dangerous condition in the first place.

It is now well established in this State that in terms of whether to impose or limit civil liability, enforcement of penal statutes serve a substantial public policy interest. *D'Agostino v. Johnson & Johnson, Inc.,* 133 *N.J.* 516, 528, 628 *A.*2d 305 (1993); *Potter v. Village Bank,* 225 *N.J.Super.* 547, 557–60, 543 *A.*2d 80 (App.Div.), *certif. denied,* 113 *N.J.* 352, 550 *A.*2d 462 (1988); *Giudice v. Drew Chemical Corp.,* 210 *N.J.Super.* 32, 36, 509 *A.*2d 200 (App.Div.), *certif. denied in part and remanded,* 104 *N.J.* 465, 517 *A.*2d 449 (1986).

■■■■ This is a case in which the duty of self-care arises "simply from the determination of the foreseeability of harm." *Carvalho, supra,* 143 *N.J.* at 573, 675 *A.*2d 209. Clearly the ingestion of a large amount of cocaine is likely to cause harm to a person's well being. Even if more than foreseeability of harm were required for a determination of a duty of self-care, the additional consideration would consist of the value judgment, based on an analysis of policy, that the users of illegal drugs have a duty of reasonable self-care after ingesting the drugs. The imposition of such a duty

of self-care furthers the public's interest. In a society in which thousands of deaths are caused each year by illegal drug activities, and many more lives are destroyed, the imposition of a duty of self-care by the judiciary "seems both fair and fully in accord with the State's policy." *Kelly v. Gwinnell*, 96 *N.J.* 538, 545, 476 *A.*2d 1219 (1984). The imposition of a duty of self-care is both consistent with and supportive of a social goal—the reduction of drug abuse—that is the polestar of our Comprehensive Drug Reform Act.

We have in the past recognized that under certain circumstances for reasons of policy and fairness, a plaintiff's failure to engage in self-protective measures may not constitute contributory negligence. The health care provider cases are an example. Another example involves some products liability cases in which injured workers have failed to follow safety procedures with the approval of supervisors in an effort to enhance quality, production, or both. *See, e.g., Green v. Sterling Extruder Corp.*, 95 *N.J.* 263, 272, 471 *A.*2d 15 (1984) (denying contributory negligence defense when blowmolding machine was used for reasonably foreseeable purpose); *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 167, 406 *A.*2d 140 (1979) (denying contributory negligence defense when workman's injuries were caused by failing to install safety devices). The fairness and policy considerations in the *Suter* line of cases that compelled that result were based on the notion that a worker engaged in his or her assigned task of working on a dangerous plant machine for its intended purpose had no meaningful choice. *Suter*, however, recognized that the Comparative Negligence Act should apply to injuries occurring even in the workplace when a plaintiff's conduct may be found to constitute contributory negligence in the sense of deliberately and unreasonably proceeding to encounter a known danger. *Suter, supra*, 81 *N.J.* at 158–64, 406 *A.*2d 140; *cf. Restatement (Third) of Torts: Products Liability* § 13, Reporters' Note, cmt. a (Tentative Draft No. 3, 1996) (recognizing that majority of courts utilize comparative fault to reduce recoveries of products liability plaintiffs with-

out requiring plaintiffs to voluntarily and unreasonably assume known risks).

In contrast, no public policy would be vindicated by refusing to permit the defense of Kiken's contributory negligence. The alleged contributory negligence of Kiken is that he deliberately and unreasonably proceeded to encounter a known danger and then failed to inform the police of his condition. Under the circumstances of this case, it is neither unreasonable nor unfair to impose a duty of self-care on Kiken requiring him not to use cocaine and if used, to inform the police that he was ill from ingesting cocaine. In terms of potential criminal liability, the use of cocaine is only a disorderly persons offense under *N.J.S.A.* 2C:35–10b. On balance, that is a minor potential criminal penalty in relation to the need to preserve life. As long as an arrestee has the capacity to engage in self-protective measures, permitting a comparative negligence defense is consistent with the important public policy objective of discouraging illegal drug use while at the same time encouraging conduct that protects health and safety. "Our statutory and case law reflect the compelling public policy that those who voluntarily become intoxicated [from alcohol or drugs] must be held responsible for the consequences of their behavior." *Lee, supra,* 127 *N.J.* at 182, 603 *A.*2d 503. This means that people who voluntarily ingest alcohol or drugs or a combination thereof, must engage in self-protective measures as long as they have the capacity to do so.

A person who overdoses on an illegal drug, like the person who drinks to the point of intoxication, should be bound by principles of comparative negligence that dictate that both persons should be accountable for their conduct up to the point the person became unable to engage in self-protective measures. To hold otherwise would place a premium on drunkenness or drug abuse.

Apart from Kiken's alleged failure to inform the police that he had used cocaine, a substance he knew or should have known was dangerous, the fact that he ingested cocaine is important because the conduct was both volitional as well as illegal. If for example,

he had gone to a physician complaining of severe back pain and the doctor injected him with a large dosage of a narcotic drug without informing Kiken of that fact and the same incidents occurred as previously outlined, the fact that Kiken did not engage in self-destructive conduct, and that he was unaware of crucial facts, would have a significant impact on both comparative fault and proximate cause.

In holding that the defense of contributory negligence is available with respect to both ingesting the cocaine and the alleged failure to inform the police, "we impart no judge-made concepts of ethics or morality." *State v. Marshall,* 130 *N.J.* 109, 157, 613 *A.*2d 1059 (1992), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). Nor do we suggest by our holding that because Kiken's act of ingesting the cocaine in the present case was volitional, the police should be absolved of all responsibility. On the contrary, if the police knew or should have known that Kiken had overdosed or was otherwise in need of emergent medical assistance, regardless of what necessitated that need, the police had a legal duty to seek medical assistance immediately. Our law does not permit law enforcement agents to ignore the medical needs of a person taken into custody simply because the medical emergency was created by the volitional act of ingesting illegal drugs or alcohol. The fact that Kiken acted in an unacceptable manner in taking drugs and then attempting to assault police officers with his automobile does not diminish the police's responsibility of providing medical assistance in a timely fashion to an arrestee. It would be both morally and legally indefensible for the police intentionally to ignore Kiken's need for emergent medical assistance.

-C-

Plaintiff argues that Kiken's ingestion of cocaine should not affect the police department's duty to render medical assistance to him upon taking him into custody. He asserts that the Appellate Division's decision effectively reduces the standard of care owed to

a drug-afflicted individual while leaving intact the duty owed to an individual in need of medical assistance for standard health reasons.

We find that argument unpersuasive. Considering the issue of comparative fault in the context of a tavern's liability to a patron, the Court in *Lee* acknowledged that the application of comparative fault does not result in diluting the tavern's duty because of the elimination of the harshness of common-law contributory negligence. *See Lee, supra,* 127 *N.J.* at 183, 603 *A.*2d 503. Under our modified comparative fault statute, a plaintiff may recover, provided that he or she is not more than fifty percent responsible for his or her own injuries. *N.J.S.A.* 2A:15–5.1. Because our comparative fault statute provides for a fair allocation of liability based on the contributing negligence of both parties, there is little danger that the recognition of a comparative fault defense will diminish a defendant's duty toward a plaintiff in any context. Comparative negligence serves to allocate damages between two or more parties at fault in causing harm. *N.J.S.A.* 2A:15–5.1 to –5.2; *see also Restatement (Second) of Torts* § 463, 464 (1965) (defining contributory negligence as conduct by plaintiff falling below standard of care reasonably necessary for self-protection). Here, it is undisputed that Kiken's ingestion of cocaine before he was arrested caused his death. We therefore hold that Kiken's pre- and post-custodial behavior is not immune from comparative fault analysis.

The system of comparative fault is based on "a policy of individual responsibility" for voluntary behavior. *See Tose v. Greate Bay Hotel & Casino, Inc.,* 819 *F.Supp.* 1312, 1315 (D.N.J. 1993). As the *Lee* Court observed, it is contrary to that principle to allow an individual to avoid responsibility for dangerous behavior when that behavior is caused largely by a voluntary decision. *Lee, supra,* 127 *N.J.* at 182, 603 *A.*2d 503 (noting the "compelling public policy that those who voluntarily become intoxicated must be held responsible for the consequences for their behavior"); *see also Tose, supra,* 819 *F.Supp.* at 1315 (stating that "voluntary

intoxication ... undermines the policy of individual responsibility on which contributory and comparative negligence defenses are based"). Kiken's ingestion of cocaine was not only voluntary, it was also an act that is particularly offensive to society. " 'In a self-governing society, law derives much of its normative force from acceptance and understanding of the justness of its principles.' " *Fisch, supra,* 135 *N.J.* at 393, 640 *A.*2d 801 (quoting *Buckley v. Estate of Pirolo, supra,* 101 *N.J.* at 82, 500 *A.*2d 703 (O'Hern, J., concurring)).

## V

The Appellate Division remanded for retrial with direction that "the jury should be instructed to compare [Kiken's] culpability in ingesting a lethal dose of cocaine with the defendant's negligent failure to summon medical assistance more promptly. If there is medical evidence that, despite the amount of cocaine in his system, he knew or should have known better than to have denied a need for such assistance, that too may enter into the weighing process." *Del Tufo, supra,* 278 *N.J.Super.* at 322, 650 *A.*2d 1044. That disposition rejects plaintiff's request that the doctrine of mitigation of damages also be applied.

Plaintiff's purpose in seeking to invoke the mitigation of damages doctrine, also known as the doctrine of avoidable consequences, is to virtually guarantee some recovery. By expressing mitigation of damages as a percentage of fault, a plaintiff's "fault will not be a bar to recovery except to the extent that her [or his] fault caused the damages." *Ostrowski, supra,* 111 *N.J.* at 446, 545 *A.*2d 148. The New Jersey Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3, does not preclude mitigation of damages under the avoidable consequences doctrine. *Ostrowski, supra,* 111 *N.J.* at 441–42, 545 *A.*2d 148.

The combined application of comparative fault, a liability theory, and the avoidable consequences doctrine, articulated in *Ostrowski,* has been limited to medical malpractice cases. The avoidable consequences doctrine is rooted in the mitigation of damages

concept. *Id.* at 437, 545 *A.*2d 148. It limits consideration of a plaintiff's fault to the time period that begins *after* a defendant's wrongful conduct. *Id.* at 438, 545 *A.*2d 148. *Scafidi* controls the causation and damage questions in medical malpractice cases where a condition that pre-existed a defendant's wrongful conduct would have caused the ultimate harm anyway. *Scafidi, supra,* 119 *N.J.* at 108–13, 574 *A.*2d 398.

■ The avoidable consequences doctrine "normally comes into action when the injured party's carelessness occurs *after* a defendant's legal wrong has been committed. Contributory negligence, however, comes into action when either the injured party's carelessness occurs *before* defendant's wrong has been committed or concurrently with it." *Ostrowski, supra,* 111 *N.J.* at 438, 545 *A.*2d 148. The doctrine does not go to the existence of a cause of action; rather it is utilized for diminution of damages. *Id.* at 442, 545 *A.*2d 148 (citations omitted); *Restatement (Second) of Torts* § 918, cmt. a, at 500 (1979).

The circumstances of this case indicate that Kiken's wrongful conduct occurred prior to defendant's alleged misconduct and it is alleged that Kiken's conduct directly affected defendant's negligence, thereby precluding applicability of the doctrine. The application of that doctrine, like the application of other negligence principles, involves line-drawing. *See Ostrowski, supra,* 111 *N.J.* at 440, 545 *A.*2d 148 (recognizing proximate cause doctrine as an expression of "line-drawing by courts and juries"). Here, we have drawn the line in cases involving voluntary consumption of alcohol or drugs in a way that excludes application of the doctrine of avoidable consequences as an instrument of overall fairness and sound public policy. *See Brown v. United States Stove Co.,* 98 *N.J.* 155, 173, 484 *A.*2d 1234 (1984).

The judgment of the Appellate Division is affirmed.

O'HERN, Justice, concurring and dissenting.

The unusual circumstances of this case, in which the victim of a cocaine overdose may have misled the police into thinking that he

did not need medical care, warrant the remand ordered by the Court. Those same circumstances may have led the Court to apply principles of comparative fault rather than causation to guide the remand. Defining the relevant principles is not easy. One of the hardest tasks in law is to weave the various threads of doctrine that assemble the warp of the fabric of our tort law. All agree that once law enforcement officials arrest someone they have a duty to provide necessary medical care to the person in their custody. *Revere v. Massachusetts Gen. Hosp.*, 463 *U.S.* 239, 103 *S.Ct.* 2979, 77 *L.Ed.*2d 605 (1983). Our instinct tells us that a criminal who overdoses on narcotics should not recover money damages from an arresting police officer. Our sense of principle tells us that the antecedent conduct of a prisoner does not relieve the custodians, be they jailers or police, of the duty to provide needed medical care to prisoners unable to care for themselves. Consider the case of a collision between two cars, one occupied by a fleeing felon and the other by a commuter returning home. Police arriving at the scene do not know which of the two unconscious bodies at the scene is that of the felon or that of the commuter. They take custody of both persons. Is their duty to provide emergency care to the felon eliminated by his antecedent misconduct? I think not.

Other examples may help to place the issues in context. If an epileptic who had drunk to excess were arrested at a protest rally for reasons unrelated to the drinking and had been placed handcuffed in the back seat of a police car, would the police be excused, under the "gatekeeping" principles of contributory negligence, from their duty to provide care if the substance abusing person suffered an epileptic seizure and died from a lack of needed care? Again, I would think not and would expect that our Court would so hold. That person, like Kiken, engaged in self-damaging conduct that made him vulnerable to injury if denied care while in police custody. What distinguishes the two cases? Is it that Kiken's conduct was criminal? Consider the case of an accomplice to a drug deal who suffers from diabetes. The accomplice is arrested and placed in the back seat of a police cruiser. If the accomplice

goes into a diabetic coma, are the police relieved of a duty to provide care because the antecedent crime has caused the accomplice to be vulnerable to such an injury? Again, I believe that the Court's answer would be "no." Because substance abuse or criminal conduct in themselves do not relieve police officers of their obligation to provide necessary medical care (after all, everyone in a police lockup has done something wrong), we must find a principle other than contributory negligence based on the substance abuse or criminal conduct that bars recovery. Although the facts of this case are basically simple, the principles to be applied are not. Several strands of familiar legal doctrine are interwoven in the resolution of this matter. The doctrines of avoidable consequences, aggravation of preexisting condition, contributory negligence, and causation each play a part.

In a fault-based system of tort reparation, the doctrine of contributory negligence serves to bar any recovery to a plaintiff whose fault contributed to the accident. Whatever its conceptual underpinnings, its effect is to serve as a gatekeeper, preventing certain parties from recovery for their injuries.[1] Richard A. Epstein, *The Social Consequences of Common Law Rules*, 95 *Harv. L.Rev.* 1717, 1736–37 (1982). Under the common-law system of contributory negligence, any fault kept a claimant from recovering. Fault in that context meant a breach of duty that was comparable to the duty of the other actors to exercise such care in the circumstances as was necessary to avoid the risk of injury incurred. The prototype of such fault was the carriage driver who crossed the train tracks as the train was approaching the crossing. *British Columbia Elec. Ry. Co. v. Loach*, 1 App. Cas. 719 (P.C.

---

[1] Legal historians still ponder the origins of such doctrines, debating whether the concepts of negligence and contributory negligence were meant to further the interests of an expanding industrial society or simply reflected the highly individualistic attitudes of the common law. Jordan H. Leibman, *Comparative Contribution and Intentional Torts: A Remaining Roadblock to Damages Apportionment*, 30 *Am. Bus. L.J.* 677, 707 n. 2 (1993); Robert J. Kaczorowski, *The Common–Law Background of Nineteenth–Century Tort Law*, 51 *Ohio St. L.J.* 1127, 1127–28 (1990).

1915). The application of the doctrine of contributory negligence was harsh, but clear. Comparative negligence is a legislative amelioration of the common law doctrine of contributory negligence. *N.J.S.A.* 2A:15–5.1 to –5.3. An actor who is not more at fault than another may recover a reduced share of damages. The doctrine of comparative negligence is well intended but blurs the conceptual clarity of contributory negligence. In order to see the issue starkly, we must be able to see how the gatekeeping function of contributory negligence would work. Would the law intend that the antecedent misconduct of prisoners excuse jailers and police of a duty to provide care for prisoners in their custody? That, after all, is how the doctrine of contributory negligence would work.

Related in effect, but not in theory, to the doctrine of contributory negligence is the doctrine of avoidable consequences. That doctrine has its roots in the law of damages. It has application in the law of contract as well as in the law of torts. *New Jersey Indus. Properties, Inc. v. Y.C. & V.L., Inc.,* 100 *N.J.* 432, 461, 495 A.2d 1320 (1985) (Stein, J., dissenting) (quoting 5A Corbin, *Contracts* § 1039 at 241 (1964)). The doctrine proceeds on the theory that a plaintiff who has suffered an injury as the proximate result of the tort of another cannot recover for any portion of the harm that by the exercise of ordinary care he or she could have avoided. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 65 at 458–59 (5th ed.1984). This doctrine has a simple thesis in public policy:

> [I]t is not true that the injured person has a duty to act, nor that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm; but recovery for the harm is denied because it is in part the result of the injured person's lack of care, and public policy requires that persons should be discouraged from wasting their resources, both physical or economic.
>
> [*Restatement (Second) of Torts* § 918 at 500, cmt. a (1979).]

The doctrine of avoidable consequences normally comes into action when the injured party's carelessness occurs *after* the defendant's legal wrong has been committed. Contributory negligence, however, comes into action when the injured party's carelessness occurs *before* defendant's wrong has been committed or concurrently with it.

Finally, there is that simplest yet often most elusive aspect of tort law, that of causation. " '[C]ausation' is an inscrutably vague notion, susceptible to endless philosophical argument, as well as practical manipulation." Glen O. Robinson, *Multiple Causation in Tort Law: Reflections on the DES Cases*, 68 *Va. L.Rev.* 713, 713 (1982). To recover in tort, "plaintiff must prove that defendant's conduct constituted a cause in fact of his injuries and loss. An act or omission is not regarded as a cause of an event if the event would have occurred without it." *Skripek v. Bergamo*, 200 *N.J.Super.* 620, 634, 491 *A.2d* 1336 (App.Div.), *certif. denied*, 102 *N.J.* 303, 508 *A.2d* 189 (1985).

These simple principles, well adapted to the case of the truck crossing the railroad track, are not so easily applied to more complex social circumstances. For example, in some cases carelessness that aggravates an injury (although not causing the injury), may precede the injury itself. *See, e.g., Waterson v. General Motors Corp.*, 111 *N.J.* 238, 544 *A.2d* 357 (1988) (failure to use seatbelt, although not cause of injury, is cause of avoidable consequences). Because we did not wish to dilute entirely (by one driver's failure to use a seatbelt) the responsibility of other motorists to drive carefully, we permitted the defense of contributory negligence for failure to use a seatbelt but limited the defense to that portion of the damages that could have been avoided by use of the seatbelt. *Id.* at 241, 544 *A.2d* 357. Thus, like many other principles of the common law, the doctrine had to be adapted to new, more complex circumstances.[2]

When the wrongdoer comes into police custody, the actor's initial wrong is usually unrelated to the "exercise [of] such care in the circumstances as [is] necessary to avoid the risk of the injury incurred" that is the hallmark of contributory negligence. *Ostrowski v. Azzara*, 111 *N.J.* 429, 437, 545 *A.2d* 148 (1988). A

---

[2] We similarly modified the usual doctrine of aggravation. *Fosgate v. Corona*, 66 *N.J.* 268, 330 *A.2d* 355 (1974) (holding that physician who asserts defense of aggravation of preexisting condition bears burden of demonstrating proper segregation of damages).

criminal act or an act of substance abuse is an altogether different type of wrong than to drive a wagon carelessly over train tracks. Consider again the case of the overindulgent civil rights protestor. But for the misconduct of fellow protestors that caused the protest to get out of control, the mild overindulgence of the epileptic protestor created no risk of being deprived of medical care. The protestor breached no duty imposed by the common law to care for one's own health. The same is true with respect to the diabetic who was an accomplice to the drug deal. Such misconduct does not constitute a breach of a duty in tort to care for one's self—unless we conclude that one has a common-law duty not to commit a crime because one must anticipate that the police would not provide medical care. Stated differently, an individual's duty to abide by our criminal laws is imposed to protect society at large, not to safeguard the health of the actor. Thus, the majority's application of principles of contributory negligence to this case does not accord with our precedent.

On the other hand, the police cannot be held responsible if their conduct was not the cause of injury. Moreover, every person has a duty to mitigate damages. Thus, I agree with the majority that the fact that "an arrestee has the capacity to engage in self protective measures," *ante* at 116, 685 *A*.2d at 1280, is relevant to the imposition of liability. Presumably the Court is referring to Kiken's failure to request medical help. However, the analysis should be that of causation or damages rather than breach of duty. As this case suggests, the officers may have had no way of knowing that the person in custody needed care.

In *Lee v. Kiku Restaurant*, 127 *N.J.* 170, 603 *A*.2d 503 (1992), the Court held that the contributory negligence of a person who drinks to excess should be considered in comparison to that of the tavern that serves the visibly intoxicated patron. There, the tavern served both the plaintiff and his driver after they had become visibly intoxicated. In assessing the tavern's liability for injuries sustained by the passenger in a subsequent car accident, the Court concluded that the jury should have considered the

passenger's fault in drinking to the point of intoxication. *Id.* at 183, 603 *A.*2d 503. Although the plaintiff in *Lee* was a passenger in the car, the principles of that case apply to suits brought by injured drivers as well. *Id.* at 182, 603 *A.*2d 503; *Fisch v. Bellshot,* 135 *N.J.* 374, 388–89, 640 *A.*2d 801 (1994). The reason that the principles of *Fisch* and *Lee* are not applicable to the circumstances of this case is that the self-damaging conduct of drunken drivers directly causes their injuries. The substance abuser drives the car into the tree. In contrast, the arrested person does not drive into the tree of medical neglect. Rather, his freedom of movement has been curtailed and he is unable to care for himself. In *Vallejo v. Rahway Police Department,* 292 *N.J.Super.* 333, 678 *A.*2d 1135 (App.Div.), *certif. denied,* 147 *N.J.* 262, 686 *A.*2d 763 (1996), the Appellate Division reviewed the analogous principles that apply when an intoxicated prisoner attempts suicide. The court did not suggest that the previous criminal act of domestic violence that occasioned the prisoner's arrest should form the basis of a defense of contributory negligence.

Hence, we should hold that if a person in police custody, able to appreciate the circumstances in which he is found, informs the police he does not need medical care, that person cannot later recover for injuries because there is no causal connection between the conduct of the police and the plaintiff's injuries. Because plaintiff misled the police, the chain of causation is broken and the jury should be instructed that plaintiff cannot recover in tort. If, however, the plaintiff is unable to appreciate the risks of his behavior, the jury should be instructed to apportion damages based on the extent to which plaintiff's voluntary ingestion of drugs or alcohol (like the person who does not wear a seatbelt) caused harm to plaintiff. Public policy requires that every person bear that responsibility.

Thus, I agree that a new trial is required in the circumstances of this case. Because of the strong public policy against the illegal consumption of narcotics, the majority states the result in terms of

duty rather than causation or avoidance of harm. As the Court has "drawn the line in [such] cases involving voluntary consumption of alcohol or drugs," *ante* at 120, 685 *A*.2d at 1282, the results will not greatly differ. The Court focuses on the ability of the person in custody to appreciate the risks of harm. "Under the circumstances of this case, it is neither unreasonable nor unfair to impose a duty of self-care on [the prisoner] requiring him not to use cocaine and if used, to inform the police that he was ill from ingesting cocaine." *Ante* at 116, 685 *A*.2d at 1280.

Both the majority and dissent agree on the core values involved:

[I]f the police knew or should have known that [the prisoner] had overdosed or was otherwise in need of emergent medical assistance, regardless of what necessitated that need, the police had a legal duty to seek medical assistance immediately. Our law does not permit law enforcement agents to ignore the medical needs of a person taken into custody simply because the medical emergency was created by the volitional act of ingesting illegal drugs or alcohol. The fact that [the prisoner] acted in an unacceptable manner in taking drugs ... does not diminish the police's responsibility of providing medical assistance in a timely fashion to an arrestee. It would be both morally and legally indefensible for the police intentionally to ignore [a prisoner's] need for emergent medical assistance.

[*Ante* at 117, 685 *A*.2d at 1281.]

Those basic principles will guide the retrial of this case.

STEIN, J., joins in this opinion.

O'HERN and STEIN, JJ., concur in part; dissent in part.

*For affirmance*—Justices HANDLER, POLLOCK, GARIBALDI and COLEMAN—4.