832 A.2d 914 (2003)
363 N.J. Super. 266
Michael AVERSANO, individually, and as Administrator ad Prosequendum of the Estate of Andrew Joseph Aversano, Deceased; and Eric Aversano, Plaintiffs-Appellants,
v.
PALISADES INTERSTATE PARKWAY COMMISSION, a public entity; Palisades Interstate Parkway Police, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 2, 2003.
Decided October 1, 2003.
*915 Richard A. Ulsamer, Newark, argued the cause for appellants (Tompkins, McGuire, Wachenfeld & Barry, attorneys; Joseph K. Cobuzio, of counsel; Mr. Ulsamer, on the brief).
Karen L. Jordan, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Jordan, on the brief).
Before Judges WEFING, WECKER and LISA.
The opinion of the court was delivered by WECKER, J.A.D.
This case arises from the tragic death of Andrew Aversano, a nineteen-year-old young man who fell backwards off a 300-foot cliff in the Palisades Interstate Park. He had been sunbathing with his brother and two friends when he got up, lost his balance, and fell. When alerted to the accident, Palisade Interstate Parkway ("Parkway") Police officers did not call the local rescue squad because they assumed that Andrew could not have survived the fall. Instead, they undertook a "recovery" operation, rather than a rescue operation. They set out to reach what they assumed was Andrew's dead body about an hour later, using a four-wheel drive vehicle and then hiking at the base of the cliffs. When the police finally reached Andrew, approximately three hours after his fall, they found that he was still breathing, had a pulse, and was moaning, but apparently was not conscious. At that point, they called for the Closter Rescue Squad.
While waiting for the rescue squad to rappel down the cliff to reach Andrew, which took one-and-one-half hours from the time the squad reached the top of the cliff, the Parkway officers kept Andrew warm and secured him from falling further down the slope. Nevertheless, by the time the rescue squad reached Andrew, he was no longer breathing. His body was raised *916 up the cliff and he was pronounced dead at the scene. The chronology of events is not in dispute.[1]
Andrew's father, Michael Aversano, arrived at police headquarters soon after the fall, and along with Andrew's brother, Eric, he apparently remained there throughout the "recovery" operation. Michael Aversano, individually and as executor of Andrew's estate, and Eric Aversano, filed a complaint against the Palisades Interstate Parkway Commission, the Parkway Police, and several fictitious persons, alleging that defendants were negligent in their maintenance and supervision of the park, in their failure to provide sufficient warnings, and in their failure to initiate efforts to rescue and bring medical aid to Andrew.
After discovery was completed, defendants moved for summary judgment, alleging *917 absolute immunity under the Tort Claims Act ("TCA") as well as the Landowners' Liability Act ("LLA"). Defendants argued that even if they were negligent in their rescue efforts, the Tort Claims Act provides immunity to public entities for injuries caused by a condition of unimproved public property. N.J.S.A. 59:4-8. In addition, they argued that the Landowners' Liability Act, N.J.S.A. 2A:42A-3, protects landowners, including public entities, from any duty to keep their premises safe for use by others for recreational activities, such as Andrew was pursuing at the time of his fall.
The motion judge granted defendants' summary judgment motion and dismissed plaintiffs' complaint.[2] In a letter opinion, the judge set forth his conclusions that Andrew's injuries stemmed from the recreational use of unimproved public property, and defendants were immune from liability pursuant to the Tort Claims Act, N.J.S.A. 59:4-8, as well as the Landowner's Liability Act, N.J.S.A. 2A:42A-3. Plaintiffs now concede, as they must, that defendants have immunity under the TCA to the extent that an alleged dangerous condition on this unimproved public land in the Palisades, or defendants' alleged failure to warn or prevent access to the cliff, bears a substantial causal relationship to Andrew's death.
The motion judge did not address the facts or the law as both relate to plaintiffs' claim that defendants negligently failed to carry out their assigned missionto save lives by taking all reasonable steps to rescue an accident victim such as Andrew and to obtain prompt medical help. In rejecting plaintiffs' claim of liability for those failures, the judge rejected what he characterized as plaintiffs' focus on Justice O'Hern's dissent in Fluehr v. City of Cape May, 159 N.J. 532, 732 A.2d 1035 (1999). Without further analysis, the motion judge concluded that "the majority decision in Fluehr, which this court is bound to follow, supports a ruling of summary judgment."
We certainly agree that the motion judge was bound to follow Fluehr, as are we, to the extent it applies. However, we find Fluehr distinguishable and therefore not controlling, for reasons we shall explain further in this opinion.
The issue we confront on plaintiffs' appeal is one the majority in Fleuhr explicitly did not reach. That issue is whether the immunity provided by the TCA (or the LLA) for certain acts or omissions in regard to the property, also provides immunity to the Commission or the Parkway Police for a violation of their duty to provide emergency rescue and medical aid when there is credible evidence that the violation reduced the victim's chances of survival. It is the minority in Fleuhr that did reach that issue. There is no jurisprudential reason to reject the minority's reasoning or conclusions on an issue the majority did not decide.
We briefly describe plaintiffs' liability claim before returning to the issue of *918 immunity. Plaintiffs' assertion that the Parkway Police failed to make a prompt rescue effort, resulting in injury defined by a lost chance of survival, invokes interrelated concepts of duty and causation. See Del Tufo v. Tp. of Old Bridge, 147 N.J. 90, 109, 685 A.2d 1267, 1277 (1996). To succeed on such a claim, plaintiffs must establish that defendants had a duty to attempt to save Andrew's life, and that if he had been reached within the time that prompt rescue efforts likely would have accomplished, his chances of survival would have been measurably greater. Hake v. Manchester Tp., 98 N.J. 302, 311, 486 A.2d 836, 841-42 (1985). "[I]n cases involving the failure to give rescue assistance, `courts have generally let a jury find the failure caused the harm, though it is often a pretty speculative matter whether the precaution would in fact have saved the victim.'" Battista v. Olson, 213 N.J.Super. 137, 151, 516 A.2d 1117, 1125 (App.Div.1986) (internal citation omitted).
Defendants do not deny a general duty to render rescue assistance to persons such as Andrew. They contend, however, that their efforts to rescue Andrew met that duty because their conduct was reasonable under the circumstances. The reasonableness of their conduct is an element of negligence that a jury normally decidesunless defendants have absolute immunity.
Defendants also dispute the proximate cause element of plaintiffs' case, arguing that even if the rescue squad had been summoned immediately, Andrew would not have survived and ultimately would have died from his injuries. Because the matter arises on defendants' motion for summary judgment, the court must accept plaintiffs' version of the facts and afford plaintiffs the benefit of all favorable inferences. Pico v. State of N.J., 116 N.J. 55, 57, 560 A.2d 1193, 1194 (1989).
Plaintiffs proffered an expert opinion with respect to Andrew's chances of survival if he had been reached by rescue squad personnel an hour and a half earlier. The Bergen County Medical Examiner, who performed the autopsy, amended the original death certificate[3] to indicate that the "manner of death" was "undetermined." In a subsequent letter to plaintiffs' counsel, the medical examiner stated:
As you can see his trauma to multiple organ systems, resulting in a state of primary and secondary shock finally terminating his life.
It is certain that there will be an agreement all around that the injuries are consistent with not being instantly/immediately fatal.
While that may be so, in my opinion, it would be impossible to put a specific time-frame to say that the shock was irreversible at a specific point in time so as to render life-saving treatment, impractical.
It would be only fair that you employ the services of an independent expert specialized in trauma cases.
Plaintiff's retained expert, Dr. Daniel Adler, a pediatric neurologist, referred to the medical examiner's statement quoted above, and offered this opinion:

*919 With respect to the central nervous system, it is clear that the brain was injured. There was subarachnoid hemorrhage, a laceration of the corpus callosum and then, cerebral edema. It is my medical opinion that none of these injuries would have proven instantly fatal with the cerebral edema occurring as a later phenomenon after the injuries caused by the initial impact. It is my medical opinion that the central nervous system issues alone would not have been sufficient to cause Andrew Aversano to pass away.
Cerebral edema can be life threatening but is a treatable condition. The direct injuries to the brain would have caused some problems with vision. The parts of the central nervous system associated with speech and language as well as motor control were not directly injured in this traumatic event. A permanent neurological injury would certainly have occurred but the full extent of that injury would not have been profound.
These opinions are provided with a reasonable degree of medical probability.
For purposes of this motion, the court must assume that plaintiffs established a prima facie case of a lost chance of survival. "To make out a claim in this narrow class of cases of lost chance of survival, plaintiffs here need establish only that defendants had a duty to try to save Robert's life and that there was a substantial possibility of the rescue of their son from death." Hake, supra, 98 N.J. at 311, 486 A.2d at 841. The sole issue to be determined is whether defendants are immune from liability on the failure to rescue claim.
The legal standard for addressing a motion for summary judgment is clear. The motion should be granted if the materials on file demonstrate that there is no genuine issue as to any material fact challenged, and that the moving party is entitled to a judgment as a matter of law. R. 4:46-2(c). In order to determine whether a "genuine issue" of material fact exists, the motion judge must consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve any disputed facts in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146, 156 (1995). The motion court's function is not to weigh the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Ibid. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)). On appeal, the appellate court applies the same standard of review as the motion court. Antheunisse v. Tiffany & Co., Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006, 1007 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989).
We recognize that the dominant theme of the New Jersey Tort Claims Act ("TCA"), N.J.S.A. 59:1-1 to 12-3, is immunity. Weiss v. N.J. Transit, 128 N.J. 376, 383, 608 A.2d 254, 257-58 (1992); Pico v. State, supra, 116 N.J. at 59, 560 A.2d at 1195. When a claim is brought against a public entity or employee, the court should ask first "whether an immunity applies and if not, should liability attach." Weiss v. N.J. Transit, supra, 128 N.J. at 383, 608 A.2d at 258; Pico v. State, supra, 116 N.J. at 59, 560 A.2d at 1195. Indeed, the Attorney General's Task Force on Sovereign Immunity expressed the hope that "in utilizing this approach the courts will exercise restraint in the acceptance of novel causes of action against public entities." Weiss v. *920 N.J. Transit, supra, 128 N.J. at 383, 608 A.2d 254.
N.J.S.A. 59:4-8 provides that "[n]either a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach." N.J.S.A. 59:4-9 grants similar immunity for injuries caused by a condition of public tidelands and submerged lands. In explaining the purpose of N.J.S.A. 59:4-8 and -9, the Attorney General's Task Force commented:
Sections 59:4-8 and 59:4-9 reflect the policy determination that it is desirable to permit the members of the public to use public property in its natural condition and that the burdens and expenses of putting such property in a safe condition as well as the expense of defending claims for injuries would probably cause many public entities to close such areas to public use. In view of the limited funds available for the acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property to assume the risk of injuries arising therefrom as part of the price to be paid for benefits received.
[quoted in Margolis and Novack, Claims Against Public Entities, comment to N.J.S.A 59:4-8 and 59:4-9 (2003).]
After pointing out that the State possesses thousands of acres of land set aside for the specific purpose of recreation and enjoyment, the comment concluded:
The exposure to hazard and risk involved is readily apparent when considering all of the recreational and conservation uses made by the public generally of the foregoing acreages, both land and water oriented. Thus in sections 59:4-8 and 59:4-9 a public entity is provided an absolute immunity irrespective of whether a particular condition is a dangerous one.

[Ibid.]
In Troth v. State, 117 N.J. 258, 269-73, 566 A.2d 515, 521-23 (1989), the Court considered the meaning of "unimproved public property." The majority determined, in a four-three decision, that because a dam in a State wildlife preserve represented a physical modification of the property from its natural state, the State did not enjoy immunity from liability for injuries caused by a dangerous condition of the dam. Id. at 272, 566 A.2d at 522-23. However, the Court also noted that the fact that the dam itself is improved property did not foreclose statutory immunity from applying to the balance of the preserve. Ibid.
The Palisades Interstate Park, like the wildlife preserve in Troth, has both improved and unimproved areas. The cliff from which Andrew fell, however, was clearly unimproved property. N.J.S.A. 59:4-8 immunity therefore would apply if Andrew's injuries were caused solely by the cliff's dangerous natural condition. The question that presents itself is whether immunity applies if the cliff's dangerous natural condition was not the sole cause of Andrew's death, and the same public entity's acts or omissions contributed substantially to reducing Andrew's chance of survival.
In Tice v. Cramer, 133 N.J. 347, 627 A.2d 1090 (1993), then Chief Justice Wilentz wrote for the Court, holding police *921 officers absolutely immune for injuries arising out of their negligent pursuit of a fleeing vehicle. In Tice, plaintiffs' decedent was killed when his pickup truck was struck by a vehicle that was being pursued by a municipal police officer. Plaintiffs claimed that the officer was negligent in initiating and continuing the pursuit. Defendants argued that they were immune from liability under N.J.S.A. 59:5-2(b)(2), which affords immunity to public entities and public employees for injuries caused by an escaping or escaped prisoner, and under N.J.S.A. 59:3-3, which affords immunity to a public employee who acts in good faith in the enforcement of any law.
In discussing the TCA generally, Chief Justice Wilentz noted that public entities are not liable for an injury, except as such liability is provided for in the TCA. Tice, 133 N.J. at 355, 627 A.2d at 1094-95. When liability is found, public entities and public employees are entitled to any immunity found in the TCA as well as any immunity established by the common law. Id. at 355-56, 627 A.2d at 1094-95. In a now often-quoted phrase, the Chief Justice wrote: "When both liability and immunity appear to exist, the latter trumps the former." Id. at 356, 627 A.2d at 1095. However, the Chief Justice immediately went on to note: "Those are the shorthand rules subject to potential variations, permutations, and combinations not yet fully developed by our cases." Ibid. The issue presented by this appeal is precisely one of those not-yet-fully-developed variations.
The issue of the immunity granted by N.J.S.A. 59:4-8 arose in Fluehr v. City of Cape May, 159 N.J. 532, 732 A.2d 1035 (1999); however, the immunity issue was addressed only by the dissenters in that four-three decision. The issue in Fluehr was whether N.J.S.A. 59:4-8 applied to a claim filed by a surfer for injuries incurred when a large wave drove him to the ocean floor and broke his neck. 159 N.J. at 534-35, 732 A.2d at 1036. The surfer sued the city, arguing that the municipal lifeguards were negligent in not warning him of dangerous ocean conditions caused by the offshore proximity of Hurricane Emily. Id. at 535, 732 A.2d at 1036. The majority rejected plaintiff's argument and held that the city was not liable for his injuries. Id. at 534, 732 A.2d at 1036.
Defendants rely on Fleuhr, as did the motion judge. Fleuhr is distinguishable on both the facts and the law. As Justice Coleman wrote for the majority in Fleuhr, "The facts in the present case ... allow us to dispose of the appeal on the theory of legal causation without reaching the merits of the immunity claim." 159 N.J. at 542, 732 A.2d at 1040. Justice Coleman recognized that "[o]rdinarily, the issue of proximate cause should be determined by the factfinder." Id. at 543, 732 A.2d at 1041. Nevertheless, the majority was convinced that "in light of the Brill standard ... the alleged negligence of the lifeguards is too remotely or insignificantly related to plaintiff's accident, so that in a legal sense, the alleged fault of the lifeguards does not constitute `a cause of the accident.'" 159 N.J. at 544, 732 A.2d at 1041 (internal citation omitted). Unlike Fleuhr, the record here may reveal a material question of fact respecting causation: whether the police delay in calling the rescue squad from 3:00 p.m., when they learned of Andrew's fall, until just before 6:00 p.m., when they found him alive, thereby delaying medical treatment and evacuation by almost three hours, caused Andrew a significant lost chance of survival.
Justice Handler, writing in dissent in Fleuhr and joined by Justices O'Hern and Stein, disagreed with the majority's conclusions that the surfer's injury and death were caused solely by the ocean condition and that no reasonable jury could find that *922 lifeguard negligence was also a proximate cause. On that mixed question of law and fact, the majority opinion controls. But Justice Handler and the minority went on to address the immunity questiona question that was not decided by the majorityobserving that the case "presents the novel question of whether immunity overrides liability when there are multiple causes contributing to an accidental injury and only one of those causes would confer immunity on the municipality." Fleuhr, 159 N.J. at 545, 732 A.2d at 1042 (J. Handler, dissenting). Justice Handler noted that N.J.S.A. 59:4-8 is silent as to whether a condition of unimproved property that is combined with other causes of accidental injury necessarily confers immunity. Id. at 546, 732 A.2d at 1042. That same question is at the heart of this appeal, and a majority of the Supreme Court has not spoken on that question. Justice Handler found no express language in N.J.S.A. 59:4-8 that would bar application of comparative negligence principles to an allocation of liability for injury caused by negligence of a public employee who is not immune. See N.J.S.A 59:3-11.
Justice Handler noted two sections of the Tort Claims Act that address the relationship between immunity for failure to supervise a recreational facility and liability for negligent supervision. N.J.S.A. 59:3-11 (as to the public employee) and N.J.S.A. 59:2-7 (as to the public entity). Fleuhr, 159 N.J. at 547, 732 A.2d at 1043.
The minority approached the causation issue in Fleuhr as concurrent causes of plaintiff's injury: the ocean condition along with lifeguard negligence. They concluded that under principles of comparative negligence, a jury should have the opportunity to determine first whether the lifeguards' conduct was negligent, and if so, to allocate fault between that negligence, which was not subject to any immunity, and the natural condition of the ocean, for which the entity is immune.
The view of the minority in Fleuhr was that:
[I]n dealing with distinct, multiple or concurrent causes that contribute to an accidental injury, one of which gives rise to governmental immunity, the Legislature intended to invoke principles of comparative negligence or fault. Therefore, I believe the proper principle of law to be applied is one that compares and balances the immunity-conferring and liability-imposing causes, as well as any contributory negligence on the part of the plaintiff, and accords each cause its proportionate weight in the allocation of statutory responsibility.
[Id. at 553, 732 A.2d at 1046-47.]
In such a situation, Justice Handler wrote, "it is appropriate to allocate damages to the government entity to the extent that a liability-imposing cause substantially increased the risk of injury." 159 N.J. at 554, 732 A.2d at 1047. Such an approach "comports with the principle of tort law that recognizes that a duty of care that encompasses a victim's own potential wrongdoing or contributory negligence can be a proper basis for liability." Ibid. (citing Steele v. Kerrigan, 148 N.J. 1, 689 A.2d 685 (1997); Cowan v. Doering, 111 N.J. 451, 545 A.2d 159 (1988)).
Justice Handler continued: "A critical factor in these situations is that a protective duty is voluntarily assumed by the governmental entity." 159 N.J. at 554, 732 A.2d at 1047. In those circumstances, comparative negligence principles considered in conjunction with the Tort Claims Act allowed him to conclude:
To the extent that the negligent [conduct] of municipal employees substantially increased the risk of injury posed by the condition of unimproved property, ... that percentage of increased *923 risk may be used to impose and allocate liability.
[Id. at 555, 732 A.2d at 1048.]
The same principle applies in the case before us, where the claimed negligence of the Parkway police in performing their assigned duties allegedly resulted in a lost chance of survival for Andrew.
Justice Handler concluded that "immunity is inapplicable where a public entity's conduct actively and negligently increases the degree of danger posed by a natural condition." Ibid. He noted that "allowing recovery only for the increased risk attributable to negligent supervision simultaneously acknowledges the immunity ascribed to the condition of the unimproved property by exonerating the municipality to the extent the immunity-conferring condition proximately contributed to the accidental injury." Id. at 555-56, 732 A.2d at 1048.
Such an approach is consistent with New Jersey law in the area of comparative negligence generally. Our tort jurisprudence allows a jury, in most instances, first to consider the liability of each of several parties under traditional elements of negligence, and then to consider the relative roles of each party found liable, in percentage terms. The closest analogy to the case before us, apart from the immunity issue itself, is in the failure to diagnose cases. See, e.g., Olah v. Slobodian, 119 N.J. 119, 574 A.2d 411 (1990); Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990).
Our law recognizes the obvious fact that an alleged tortfeasor in a medical malpractice case, the medical doctor, had nothing to do with the patient's ill fortune in having contracted a disease. In that respect, the doctor is comparable to the Parkway police, who had no legal responsibility for Andrew's fall. But the jury is allowed to consider whether the doctor's failure to diagnose and treat the condition promptly was a deviation from the accepted standard of care that increased the risk of a bad outcome (or deprived the patient of a substantial chance of a better outcome). If so, the jury next considers what the patient's chances would have been, in percentages, had the diagnosis been timely made. Finally, the jury determines the percentage by which that chance of survival was reduced by the delay in diagnosis. That is the classic "lost chance" case.
Plaintiffs' claim is that defendants deviated from the standard of care applicable to the Parkway police, whose duty it is to address emergencies arising in their jurisdiction and take reasonable steps to obtain rescue services for those who may be injured in or around their property. According to plaintiff, that deviation caused a delay in treatment that arguably lost Andrew whatever chance he had to survive, a chance that plaintiffs' medical expert would say was not negligible. Taking defendants' immunity fully into account, plaintiffs' claim of negligence as a proximate cause of a lost chance of survival is indistinguishable from the lost chance cases in the medical malpractice area.
In a separate dissent in Fleuhr, Justice O'Hern, joined by Justices Handler and Stein, noted that "[t]he Tice rule that immunity trumps liabilitydoes not apply" where there are two causes of injury, and immunity applies only to one. Fleuhr, supra, 159 N.J. at 559, 732 A.2d 1035. Justice O'Hern stressed that while the municipality was immune to liability for deciding not to provide lifeguard services, once provided, the lifeguards' duty was "to save drowning ocean bathers." Id. at 562, 732 A.2d at 1051. See also N.J.S.A. 59:2-7; N.J.S.A. 59:3-11. Likewise, the very essence of the Parkway Police's duty here was to protect life by promptly attempting rescue and calling for medical help for persons injured in the park.
*924 Justice O'Hern stressed that in Tice, the bases of both liability and immunity derived from the same injurious conduct, and that the Tice rule did not apply in Fluehr because there were two separate, although concurrent causes of the surfer's injury. Fleuhr, 159 N.J. at 559, 732 A.2d at 1050. Reasoning that a different standard governed the lifeguards' conduct than that which governed the condition of the property, he concluded that "[t]he municipality's immunity for the natural condition of the ocean has no effect, trumping or otherwise, on the municipality's liability for the alleged negligence of its lifeguards." Id. at 559-60, 732 A.2d at 1050.
The three dissenters in Fluehr thus believed that the total immunity rule of Tice was not applicable to injuries caused in part by a natural condition of unimproved public property and in part by the negligence of public employees that was unrelated to the condition of the property. The fact that the Fluehr majority did not rely upon Tice in rendering its decision casts doubt upon the applicability of the oft-quoted "immunity-trumps-liability" phrase to cases where the injuries arise from separate causes, not all of which would separately be entitled to immunity. Both Justice Handler and Justice O'Hern distinguished Tice, where there was unity of action by the same tortfeasors, suggesting that in Fleuhr and other cases where there are at least two causes of an accident, each of which is dependent upon distinct duties and actions, Tice would not necessarily govern.
Justice O'Hern's reasoning applies equally well to the case before us. Where there are allegedly two distinct causes of Andrew's death, it is fair to say that Tice does not compel the conclusion that N.J.S.A. 59:4-8 immunizes the defendants on the failure to provide rescue and medical care. Unlike Tice, this case does not involve concurrent causes of a single injury. It involves an initial very serious injury for which defendants have no responsibility, followed by alleged negligence of Parkway police in addressing a medical emergency which allegedly deprived Andrew of some measurable chance of survival.
There is precedent for finding police liable for negligent performance of rescue duties. On several occasions, we have found that police officers who negligently render rescue assistance are subject to liability under the TCA. In Praet v. Borough of Sayreville, 218 N.J.Super. 218, 221, 527 A.2d 486, 487 (App.Div.), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987), plaintiff's husband died from burns suffered when his automobile caught fire following a traffic accident. The record showed that decedent struck a pole, causing his car to overturn and trapping him inside with only minor injuries. Ibid. Police officers arrived at the scene promptly but were unable to extricate decedent from the vehicle. Ibid. When a fire broke out, officers called the fire department and attempted to extinguish the blaze themselves. Ibid. Unfortunately, before he could be removed from the car, decedent suffered serious burns that eventually led to his death. Ibid.
The plaintiff in Praet claimed that the officers were negligent in their rescue efforts and filed a complaint enumerating a series of specific errors by the officers. Id. at 221-22, 527 A.2d at 487-88. The defendants moved for summary judgment, claiming that they were immune from liability under the Good Samaritan Act, N.J.S.A. 2A:62A-1. Judge Pressler, writing for the court, held that plaintiff had stated "a viable cause of action ... cognizable under the New Jersey Tort Claims Act," 218 N.J.Super. at 222, 527 A.2d at 488, and that the Good Samaritan Act did *925 not confer immunity on a public employee who had a preexisting duty to render emergency assistance. Id. at 223, 527 A.2d at 488. The court reasoned that their preexisting duty impelled the officers to act, thus negating any right to statutory immunity. Id. at 224, 527 A.2d at 489.
In Suarez v. Dosky, 171 N.J.Super. 1, 5-6, 407 A.2d 1237, 1239 (App.Div.1979), certif. denied, 82 N.J. 300, 412 A.2d 806 (1980), State Police officers refused to render assistance to a family whose vehicle was stranded at night along the side of Interstate 80. As the family was walking along the shoulder of the highway toward the nearest exit, one of the children wandered out into the lane of traffic and was killed by an automobile. The child's mother attempted to reach the child and was also struck and killed. Ibid. The surviving husband sued, claiming that the officers breached their duty to aid citizens in distress. The State claimed that the officers were immune from liability under N.J.S.A. 59:5-4, which provides that "[n]either a public entity nor a public employee is liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service."
We rejected the State's argument, finding nothing in the language of N.J.S.A. 59:5-4 to negate the common law duty of police officers to perform their duties adequately. 171 N.J.Super. at 7-8, 407 A.2d at 1239-40. We concluded that:
Although a police officer may not be liable for failing to respond (if, for example, he was performing some other official duty), if he does respond he will be subject to liability for negligence in the performance of his ministerial duties. N.J.S.A. 59:5-4 does not insulate police officers from unfortunate results of their negligently executed ministerial duties.
[Id. at 9-10, 407 A.2d at 1241.]
In Del Tufa v. Tp. of Old Bridge, 278 N.J.Super. 312, 326, 650 A.2d 1044, 1051 (App.Div.1995), aff'd, 147 N.J. 90, 685 A.2d 1267 (1996), we held that police defendants did not have immunity under the TCA for negligence in failing to summon emergency medical assistance to an arrestee. See also Hake v. Manchester Tp., supra, 98 N.J. at 305, 486 A.2d at 837, where the Court, while finding that the TCA created "no affirmative duty" to provide first aid to an arrestee who hanged himself in the municipal jail, nevertheless reversed the dismissal of plaintiff's claim against the police for "failure to provide prompt emergency rescue efforts."
Once again, the analogy to the case before us is clear. Had the Parkway police been out on other calls and unable to respond more quickly, immunity would apply. If the police had no means of obtaining medical treatment by someone trained to reach Andrew, immunity would apply. And if the police had concluded that the danger to medical rescue personnel was too great to risk rappelling down the cliff to Andrew's aid, immunity would apply to that discretionary decision. But none of those scenarios fit the facts here. The police had the ability (and the responsibility)[4] to call the Closter Rescue Squad.
*926 As we know, the Closter Rescue Squad was willing and able to take the extraordinary steps necessary to reach Andrew, and to do so within an hour and a half of reaching the cliff top. But the police made a decision not to bother calling the rescue squad because they assumed Andrew was already dead. Their conduct was not a concurrent cause of Andrew's injuries, along with his fall; it was a subsequent act of omission that deprived Andrew of the very thing the Parkway officers were obligated to provide: emergency rescue and medical assistance. Whether Andrew would have survived had he received medical help that much sooner is a question on which plaintiffs would have presented expert testimony at trial.
The provisions of the Tort Claims Act governing immunity and liability of the entity generally track the provisions relating to immunity and liability of the public employee. "A public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him," N.J.S.A. 59:3-2a, and "[a] public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity." N.J.S.A. 59:2-3a. The immunity afforded to a public employee by N.J.S.A. 59:3-2 does not immunize "a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions." Ibid. The entity is liable for injury caused by its employee acting or failing to act within the scope of his employment, N.J.S.A. 59:2-2a, and is not liable where the public employee is not liable. N.J.S.A. 59:2-2b.
Calling the rescue squad in a case like this, as the officers eventually did three hours later, is not a discretionary act that requires a high degree of judgment. In our view, it falls well within the bounds of a ministerial act. See Del Tufo, supra, 278 N.J.Super. at 326, 650 A.2d at 1051; Praet, supra, 218 N.J.Super. at 223, 527 A.2d at 488; Suarez, supra, 171 N.J.Super. at 9-10, 407 A.2d at 1241.
As we noted above, immunity would apply to a police officer's judgment undertaken in the course of a rescue effort, irrespective of whether that judgment was negligent. But here, the supervising officer's alleged negligence was the very act of deciding not to rescue. The officer here decided, based upon a mistaken decision that Andrew was beyond medical help, not to call for help. Considering that the very reason for the Parkway police's existence was to insure that emergencies did not go unattended, the motion judge erred in viewing summary judgment as a question of the strength of plaintiffs' evidence of causation. In that approach, he was not justified in following the majority in Fleuhr. Had the judge recognized the Parkway police officers' duty to provide rescue and emergency medical assistance for Andrew, he could have addressed the immunity issue directly.
A rule of total immunity arising from N.J.S.A. 59:4-8 would lead to inconsistent results. For example, if a hiker walking along the trail at the base of the Palisades tripped over a rock, severely injuring himself, negligent police rescue efforts would be immune from liability because the hiker's injuries were caused by a natural condition of unimproved public property. On the other hand, if the same hiker walking along the same trail suffered a heart attack, no immunity would apply to negligent rescue efforts because the hiker's injuries were not caused by a natural condition of the property. There is no reason to conclude that the police do not owe the hiker the same duty of care in both situations, or *927 that the Legislature intended to abrogate that common law duty to render rescue assistance to an injured person.
The motion judge also found that defendants were immune from liability under the Landowner's Liability Act, N.J.S.A. 2A:42A-3. That statute provides:
(a) An owner, lessee or occupant of premises, whether or not posted as provided in section 23:7-7 of the Revised Statutes, and whether or not improved or maintained in a natural condition, or used as part of a commercial enterprise, owes no duty to keep the premises safe for entry or use by others for sport and recreational activities, or to give warning of any hazardous condition of the land or in connection with the use of any structure or by reason of any activity on such premises to persons entering for such purposes. (b) An owner, lessee or occupant of premises who gives permission to another to enter upon such premises for a sport or recreational activity or purpose does not thereby (1) extend any assurance that the premises are safe for such purpose, or (2) constitute the person to whom permission is granted an invitee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by any act of persons to whom the permission is granted.
In Harrison v. Middlesex Water Co., 80 N.J. 391, 395, 403 A.2d 910, 911-12 (1979), the wife of a man who drowned while trying to rescue two children who fell through the ice on a frozen reservoir brought a wrongful death action against the private property owner. The property owner claimed that it was immune from liability under the LLA. Id. at 396, 403 A.2d at 912. The Court rejected the immunity claim, finding that the LLA did not apply to land situated in populated, residential neighborhoods. Id. at 397, 403 A.2d at 913. The Court held that when the Legislature enacted the LLA, it contemplated "primarily undeveloped, open and expansive rural and semi-rural properties where hunting, fishing and trapping might be expected to take place." Id. at 400, 403 A.2d at 914. The Court cautioned that
[d]ecisions which totally disregard the use for which the land is zoned, the nature of the community in which it is located, its relative isolation from densely populated neighborhoods, as well as its general accessibility to the public at large, take too expansive a view of the immunity conferred by the Legislature.
[Id. at 401, 403 A.2d at 915.]
The motion judge found immunity under the LLA as well as the TCA in this case. The Palisades Interstate Park is located in a densely populated county, where it is openly accessible to large numbers of people. On the other hand, most of the park area apparently is undeveloped and even wild. We need not decide whether the Park is the sort of "premises" to which the Legislature intended to extend immunity, because assuming the LLA would apply, it would not abrogate the Parkway Police officers' common law duty to rescue and obtain emergency medical assistance. We are satisfied that any immunity provided to defendants in this case by the LLA is limited to the same extent and for the same reasons as is immunity under the TCA.
Reversed and remanded for further proceedings.
WEFING, J.A.D., Dissenting.
This case is undoubtedly tragic, but the natural human sympathy that any person *928 must feel for Andrew's father and brother cannot serve as a predicate for our analysis, which must take place within the structure of the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 ("TCA"). My colleagues have concluded, on the basis of dissenting comments by Justices Handler and O'Hern, that these defendants are not entitled to the statutory immunity conferred upon them by the Legislature. I am unable to agree and reluctantly dissent.

I.
The Palisades Interstate Park Commission and its police force are public entities within the scope of the TCA. N.J.S.A. 59:1-3. The starting point in any consideration whether either the Commission or its police force[1] may be subject to suit for this incident is N.J.S.A. 59:2-1(a) which clearly provides:
[e]xcept as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person. In recommending this formulation to the Legislature, the Report of the Attorney General's Task Force on Sovereign Immunity, 1972 ("Task Force Report") expressed the hope that "courts will exercise restraint in the acceptance of novel causes of action against public entities." Our courts have recognized this expression of the legislative intent. Ayers v. Jackson Tp., 106 N.J. 557, 598, 599, 525 A.2d 287, 308-09 (1987); King by King v. Brown, 221 N.J.Super. 270, 276-77, 534 A.2d 413, 415-16 (App.Div.1987). It was within that well-established framework that Chief Justice Wilentz wrote when he succinctly stated, "When both liability and immunity appear to exist, the latter trumps the former." Tice v. Cramer, 133 N.J. 347, 356, 627 A.2d 1090 (1993).
Tice is an excellent example of that principle. In that case, Officer Robert Cramer of the Wildwood Police Department pursued a fleeing vehicle driven by William G. Logan. Id. at 351, 627 A.2d at 1093. In the course of the pursuit, Logan went through three stop signs and at the fourth, collided with a vehicle driven by John W. Tice, Jr. Id. at 352, 627 A.2d at 1093. Tice was killed in the collision, as was a passenger in one of the vehicles. Wildwood, its Police Department, and Officer Cramer all ultimately prevailed in their claim of immunity from suit in the resulting litigation. Writing for the Court, Chief Justice Wilentz noted the framework of the TCA, stating, "[t]he liability of the public entity must be found in the Act, and where found, is subject to any immunity found in the Act and further subject to any immunity previously established by common law." Id. at 355, 627 A.2d at 1095. Chief Justice Wilentz continued:
We recognize that the liabilities of public employees, even under the Act, were not "frozen" as they existed in 1972, and that this Court, through its traditional common law function in developing decisional law, as well as through the limited power given it by the Act for flexible decision-making in construing the Act, may expand those public employee liabilities. Under no circumstances, however, may those liabilities, whatever their origin, trump the immunities provided for in the Act. Where inconsistent, the liabilities fall, the immunities stand.
[Tice, supra, 133 N.J. at 369, 627 A.2d at 1102 (citations omitted).] *929 My colleagues conclude in one portion of their opinion that the Tice analytical framework does not bear on this case because we are dealing with independent causes. The Court, however, rejected this view in Tice, saying that a concurrent cause is not sufficient to defeat immunity. Id. at 357, 627 A.2d at 1095-96. Chief Justice Wilentz noted in Tice that concurrent acts of alleged negligence are insufficient to overcome a statutory immunity, recognizing that when the Legislature intended to do so, it restricted a particular immunity to injuries resulting from a single cause. Id. at 366, 627 A.2d at 1100, citing N.J.S.A. 59:4-7, conferring immunity for injuries "caused solely by the effect on the use of streets and highways of weather conditions" (emphasis added). Similarly, N.J.S.A. 59:4-8 and -9, the statutes at issue on this appeal, contain no such limitation.
My colleagues conclude in another portion of their opinion that this case presents an instance not of concurrent causes, but of a "subsequent act of omission" (slip op. at 26). Nothing within the TCA, however, purports to impose liability on these public entity defendants for such a "subsequent act." If there is to be a liability, it must come from the Legislature, not from the judiciary.
My colleagues analogize this situation to the increased risk analysis adopted by the Court in the context of medical malpractice litigation in Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990). The analogy, in my view, does not hold. A physician defendant bears no liability if a patient develops cancer because the actions of the physician played no role in the happening of the disease. It is appropriate, in such an instance, to hold a physician liable if the doctor's failure promptly to diagnose the disease deprived the patient of a substantial chance of a better outcome. Here, however, defendants bear no liability for Andrew's fall and injuries because the Legislature has made a policy judgment they are immune from suit. In my view, a holding that defendants can be found liable for alleged negligence in responding to Andrew's fall subverts that absolute immunity decreed by the Legislature.
My colleagues point to Praet v. Bor. of Sayreville, 218 N.J.Super. 218, 527 A.2d 486 (App.Div.), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987), and Suarez v. Dosky, 171 N.J.Super. 1, 407 A.2d 1237 (App.Div.), certif. denied, 82 N.J. 300, 412 A.2d 806 (1980), as supporting their conclusion that these defendants can be subject to suit for their alleged negligence. Neither case, in my view, supports the result here.
Defendants in Praet did not assert immunity under the TCA but rather relied upon N.J.S.A. 2A:62A-1, commonly referred to as the Good Samaritan Act. We concluded that that statute was not incorporated within the TCA through N.J.S.A. 59:3-1(b). We were not confronted in Praet with a specific immunity conferred by the TCA itself, as we are in the present matter.
Defendants in Suarez, in contrast, did cite to a specific TCA provision, N.J.S.A. 59:5-4, to support their assertion of immunity. We concluded that the legislative purpose in enacting that section was to "preclude[ ] suits ... based upon contentions that damage occurred from the absence of a police force or from the presence of an inadequate one," id. at 9, 407 A.2d at 1241, rather than to overturn a previously well-recognized cause of action against police officers "for tortious inadequacies in the performance of their duties." Id. at 8, 407 A.2d at 1240. Upholding the claim of immunity here, however, represents no departure from existing law but rather an application of it.
*930 My colleagues also refer to Del Tufo v. Old Bridge, 147 N.J. 90, 685 A.2d 1267 (1996), and Hake v. Manchester, 98 N.J. 302, 486 A.2d 836 (1985), to support their view that these public entity defendants have no immunity from liability for their actions on May 1, 1999. In my judgment, those cases provide no support for a determination that these public entity defendants are subject to suit. Those cases involved questions of causation and comparative fault, not claims of immunity under the TCA. It is vital that New Jersey's millions of residents have access to parks, beaches and open land for recreation. Encouraging the preservation of "lands in a natural, open and environmentally wholesome state ... is an important policy in view of the substantial and seemingly relentless shrinkage and disappearance of such land areas from the face of our State. It is a concern well known to the Legislature and the preservation of such lands is very much an integral part of our governmental and public policy." Harrison v. Middlesex Water Company, 80 N.J. 391, 400, 403 A.2d 910, 914 (1979). Although New Jersey is the most densely populated state in the nation, large areas of the state remain undeveloped. At the time the TCA was adopted, the Task Force Report estimated that the State held more than 900,000 acres that fit within the immunities conferred upon it by N.J.S.A. 59:4-8 and -9. The Legislature has made a policy judgment that "the burdens and expenses of putting such property in a safe condition as well as the expense of defending claims for injuries would probably cause many public entities to close such areas to public use." Margolis and Novack, Claims Against Public Entities, comment to N.J.S.A. 59:4-9 (1997). The same adverse consequences may also follow from exposing public entities to claims for alleged negligence relating to failed rescue efforts in connection with the use of these recreational areas, some of which are located in remote regions of the State.

II.
Because I am satisfied that defendants are immune from this suit under the TCA, it is unnecessary to address at length whether they are also immune under the Landowner's Liability Act, N.J.S.A. 2A:42A-2 to -10. I would merely note that applicability of the Act is not necessarily restricted to tracts of land located in rural areas. Weber v. United States, 991 F.Supp. 694 (D.N.J.1998).
My colleagues note the reference in Harrison v. Middlesex Water Co., supra, 80 N.J. at 400, 403 A.2d 910, that the Act is directed to "primarily undeveloped, open and expansive rural and semi-rural properties where hunting, fishing and trapping might be expected to take place." They then note that Palisades Interstate Park "is located in a densely populated county [and is] openly accessible to large numbers of people" (Op. at 286, 832 A.2d at 927). The Park, however, comprises approximately two thousand, five hundred acres, with thirty miles of hiking trails. This is clearly distinguishable from the property at issue in Harrison, which totaled 136 acres and included a treatment plant and pumping station. In addition, the area surrounding the water company's land had
become heavily populated and the property [was] bounded by a regional high school, several athletic fields, a tennis court, two social clubs and a number of private homes whose rear lots extend[ed] almost to the edge of the lake. [Id. at 394, 403 A.2d at 911.]

III.
Finally, I note the limited scope of the issue before us. Defendants' motion to the trial court rested solely on the grounds of *931 immunity, and immunity was the only legal issue addressed by the parties on this appeal. My colleagues discuss briefly the opinion proffered by plaintiffs' medical expert and assume for purposes of their analysis the sufficiency of that opinion. The trial court did not address that question, however, and, thus, we have made no determination that the proofs that plaintiffs have assembled in support of their claim are legally sufficient to go forward.
NOTES
[1] p.m. Parkway police receive telephone call at headquarters
 from the Alpine police, who had received a report that
 someone had fallen from the cliff.
3:08- Three Parkway police officers reach the cliff top area
3:10 from which Andrew fell. Officer Siri sports Andrew's
p.m. legs near the bottom of the cliff.
3:13. Sgt. Cook also sports Andrew.
p.m.
3:30. Sgt. Cook returns to police headquarters and speaks to
p.m. Sgt. Parr. They decide that retrieval of Andrew's body
 can wait for arrival of the 4-12 p.m. shift. They call
 the county medical examiner to be ready to receive a
 body.
4 p.m. Sgt. Cook and four officers set out from the Alpine Boat
 Basin along the barely passable "Shore Trail."
5:59 They reach Andrew, find him still alive, call the
p.m. Closter Rescue Squad, and put Hedevac on alert.
6:05- Englewood Hospital paramedics and Closter Rescue Squad
6:08 arrive at the cliff top. Closter Rescue sets up
p.m. rappelling equipment.
6:58 Andrew stops breathing.
p.m.
7:30 Closter rappellers reah Andrew, 1 1/2 hours after they
p.m. were called. He is no longer alive; they bring his body
 up the cliff in a basket.
8:00 Andrew is pronounced dead'.
p.m.

[2] The order for summary judgment states that it is "without prejudice." Nothing in the judge's decision suggests that the order was intended to be without prejudice, and we assume that phrase appears in error.
[3] The original death certificate listed the cause of death as "contusion of brain and bilateral lungs, secondary to precipitation from estimated three hundred feet."
[4] The Parkway Police officers were appointed in accordance with N.J.S.A. 32:14-21, which states that they have "all the powers, duties and liabilities of police officers in cities." Among the duties imposed on police officers in cities is the duty to render emergency assistance to citizens in distress. Praet v. Borough of Sayreville, supra, 218 N.J.Super. at 223, 527 A.2d at 488. Moreover, the Parkway Police Department's written "Standard Operating Procedures for Emergency Services," in effect on the date of this accident, includes a list of the rescue service to be called, depending on the location of the need:

When rescue equipment is needed from [the area where Andrew fell], the ALPINE FIRE DEPT and CLOSTER RESCUE SQUAD will be called.
[1] The Commission and the Palisades Interstate Parkway Police are the only named defendants. None of the individual officers involved in this incident have been joined in this litigation.