

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-3-2005

# Rosario v. Union Cty Pol Dept

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2832

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Rosario v. Union Cty Pol Dept" (2005). *2005 Decisions.* Paper 1257.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1257

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 03-2832 & 03-2962

———————

STEPHEN ROSARIO, Administrator of the ESTATE OF ESTEBAN ROSARIO;
STEPHEN ROSARIO, Individually; ESTEBAN ROSARIO, JR., a legally
adjudicated mental incompetent, by his legal guardian; JO ANN ROSARIO;
WILLIAM ROSARIO

v.

CITY OF UNION CITY POLICE DEPARTMENT;
NORMAN BAREIS, Chief of Union City Police Department;
CITY OF UNION CITY;
GLENN GASTON, Detective; JUAN LOACES, Detective;
JOSE PEREZ, Police Officer; JUAN MENDEZ, Police Officer;
JOHN DOES 1-10, the names being fictitious, the persons intended
being the police officers involved in this incident

Detective Glenn Gaston,
Detective Juan Loaces,
Police Officer Jose Perez,
Police Officer Juan Mendez,
          Appellants at No. 03-2832

Stephen Rosario, Administrator of the Estate of
Esteban Rosario; Stephen Rosario, Individually;
Esteban Rosario, Jr., a legally adjudicated mental
incompetent, by his legal guardian; Jo Ann Rosario;
William Rosario,
          Appellants at No. 03-2962

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 00-cv-03702
(Honorable William H. Walls)

Argued January 25, 2005

Before: SCIRICA, *Chief Judge*, RENDELL and FISHER, *Circuit Judges*

(Filed: May 3, 2005)

ANDREW L. INDECK, ESQUIRE (ARGUED)
Scarinci & Hollenbeck
1100 Valley Brook Avenue
P.O. Box 790
Lyndhurst, New Jersey 07071
    Attorney for Appellants/Cross-Appellees,
    Detective Glenn Gaston, Detective Juan Loaces,
    Police Officer Jose Perez, Police Officer Juan Mendez


VICTOR S. VALENTI, ESQUIRE (ARGUED)
GEOFFREY N. FIEGER, ESQUIRE
Fieger, Fieger, Kenney & Johnson
19390 West Ten Mile Road
Southfield, Michigan 48075

JEFFREY E. PHILLIPS, ESQUIRE
Phillips, Krantz & Levi
204 West 84th Street
New York, New York 10024
    Attorneys for Appellees/Cross-Appellants,
    Stephen Rosario, Administrator of the Estate of Esteban Rosario;
    Stephen Rosario, Individually; Esteban Rosario, Jr., a legally adjudicated
    mental incompetent, by his legal guardian Jo Ann Rosario; William Rosario

SCIRICA, *Chief Judge*.

Plaintiffs claim that Defendants, all police officers with the City of Union City Police Department, failed to provide adequate medical treatment to their father, Esteban Rosario, after he was placed under arrest on October 27, 1999. Esteban Rosario died of an asthma attack soon after being arrested. Following a five-week trial in the District of New Jersey, the jury returned a verdict of $2.5 million to Esteban Rosario's estate for his pain and suffering, and awarded $3 million to the plaintiffs on their wrongful death claim. The District Court vacated the $3 million award upon defendants' motion for j.n.o.v., and both parties now appeal. We will affirm the judgment of the District Court.

I.

Because we write only for parties who are familiar with the facts, we do not restate them in great detail.

In the course of executing an arrest warrant for Osvaldo Garcia on narcotics-related charges, defendants in this case– City of Union detectives Jose Perez, Juan Mendez, Glenn Gaston, and Juan Loaces– entered the home of Esteban Rosario. Rosario was arrested for hindering/obstructing the arrest of Osvaldo Garcia, his step-son, and for allegedly assaulting Detective Loaces. Following his arrest, he suffered an asthma attack.

Although he was eventually given oxygen and an ambulance was called, he died before arriving at the hospital.

Esteban Rosario's four children– plaintiffs Stephen Rosario, William Rosario, Esteban Rosario, Jr., and Joanne Rosario– brought a wrongful death action against Union City, its police department, the police chief, and four individual detectives, stating the following claims: (1) illegal entry, illegal arrest, excessive force, and failure to administer medical attention, under color of law; (2) municipal liability under § 1983 for violation of Rosario's constitutional rights; (3) negligent hiring, supervision, and retention; (4) assault and excessive force against the individual detectives; and (5) respondeat superior claims for failure to administer medical care, negligent medical care, and intentional refusal to give medicine.

The District Court granted summary judgment for the police department and its chief on all municipal liability claims under § 1983, with the exception of the claim relating to negligent retention. Following trial, the jury found that Detective Loaces was liable for false arrest; that all four defendant detectives were negligent in providing medical care; and that Esteban Rosario's estate was entitled to $2,500,000 in compensation for decedent's pain and suffering. The jury also awarded $3,000,000 in compensation for the loss of support and guidance suffered by plaintiffs. With respect to all other claims submitted to the jury, defendants were found not liable. On defendants'

4

motion for j.n.o.v., the District Court struck the $3 million jury award as outside the scope of New Jersey's wrongful death statute based upon the evidence presented at trial.

On appeal, defendants make five claims. First, they argue the District Court erred as a matter of law when it declined to grant good faith immunity to defendants under N.J.S.A. 59:3-3. Second, defendants claim the District Court erred in excluding from evidence the officers' arrest warrant for Garcia and testimony from the chief of police regarding the ongoing narcotics investigation in Rosario's neighborhood. Third, defendants claim that evidence of prior bad acts by Gaston and Loaces should have been excluded as unduly prejudicial. Fourth, they claim the District Court erred in admitting the police department's internal affairs report. And finally, defendants argue the District Court should have excluded portions of an allegedly unauthenticated videotape that was shown to the jury. On cross appeal, plaintiffs make two assignments of error. First, they argue the District Court erred in vacating the $3 million jury verdict. Second, plaintiff Joanne Rosario argues that the District Court erred in holding she had only sued in her capacity as the legal guardian of Esteban Rosario, Jr., and not also in her individual capacity.

II.

The District Court had jurisdiction over plaintiffs' § 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343, and had supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

5

We exercise *de novo* review over the District Court's legal conclusions and review its evidentiary decisions for abuse of discretion. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293 (3d Cir. 1997).

III.

A.     <u>Immunity</u>

The jury found defendants were negligent in their provision of medical care to Esteban Rosario. Each of the four defendants– Perez, Mendez, Gaston, and Loaces– was found liable on the claim for negligent provision of medical services, while only Detective Loaces was found liable for false arrest. The evidence at trial established that detectives Loaces and Perez confronted Garcia initially, requested identification, followed him into decedent's apartment, and arrested Garcia. Once inside the dwelling, Loaces called outside to Mendez and Gaston for assistance in arresting Rosario. At that time, Mendez and Gaston entered Rosario's home.

All four defendant detectives were present at the scene when Rosario was arrested, led to the patrol car, and suffered an asthma attack and collapse. With respect to the administration of medical care, eyewitness testimony presented at trial offered competing views of defendants' response. Detective Gaston testified that he administered an inhaler to Rosario, while other witnesses testified that the inhaler was never administered. Detectives Perez and Gaston testified that they checked his pulse. Several officers testified that they administered oxygen from the patrol car as soon as possible, but other

6

eyewitnesses testified that the officers stood by and waited several minutes before looking for oxygen.

Furthermore, other eyewitnesses testified that the detectives appeared to enjoy watching Rosario experience pain, suggested to one another that they "let him die," and took no steps to provide meaningful assistance. Defendants testified to the contrary, stating that they called the ambulance as soon as possible, removed Rosario's handcuffs, checked his pulse, and administered the inhaler and oxygen. The jury heard this conflicting testimony and found defendants negligent. Defendants argue that despite this jury finding, police officers are immunized from negligence liability by the New Jersey Tort Claims Act.[1]

The New Jersey Tort Claims Act was designed to reestablish the immunity of public entities while relieving some of the harsh results of the doctrine of sovereign immunity. *See* N.J.S.A. 59:1-2. Consistent with this purpose, the Act provides for immunity as the general rule, with liability the exception. *Collins v. Union County Jail*, 696 A.2d 625, 628 (N.J. 1997). The Act's "good faith" immunity, codified in N.J.S.A. 59:3-3, provides:

---

[1]The jury charge included state claim 3, negligent provision of medical care. The District Judge did not give an instruction on good faith immunity, however, reasoning that defendants' reliance on N.J.S.A. 59:3-3 was foreclosed by *Del Tufo v. Township of Old Bridge*, 650 A.2d 1044 (N.J. Super. 1995) *aff'd on other grounds* 685 A.2d 1267 (N.J. 1996).

A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.

The threshold inquiry under N.J.S.A. 59:3-3 is whether defendants were executing or enforcing the law at the time at issue. Generally, public officials engaged in enforcing the law will be immunized for negligent actions undertaken in good faith. *See, e.g., Canico v. Hurtado*, 676 A.2d 1083, 1085 (N.J. 1996) (holding that police officer was "enforcing the law" by responding to a radio call directing him to the scene of the crime and that the officer, therefore, was immunized from liability for injuries caused to plaintiff by negligent driving on his way to the crime scene).

Depending on the facts, however, whether public officials were enforcing the law is not necessarily determinative in finding immunity. The detectives here were engaged in enforcing the law. But under New Jersey law, immunity from liability for good faith actions undertaken during law enforcement does not relieve a police officer from the duty to administer emergency medical assistance to an arrestee. *See Del Tufo v. Township of Old Bridge*, 650 A.2d 1044 (N.J. Super. 1995) *aff'd on other grounds* 685 A.2d 1267 (N.J. 1996). In *Del Tufo*, decedent's estate brought a wrongful death action against police officers, alleging their failure to administer proper medical care during the course of decedent's arrest was the proximate cause of his death. The officers had observed decedent's abnormal movements, lacerations, and seizures, yet waited almost an hour to summon an ambulance. By the time an ambulance was called and decedent was rushed to

8

the hospital, he had died of cardiac failure caused by ingestion of large amounts of cocaine.

Noting that "when the police arrest someone, they have a duty to provide necessary medical treatment," the court specifically found that N.J.S.A. 59:3-3 was inapplicable to the *Del Tufo* defendants:

> The plaintiff in the present case is not complaining that the defendants should not have executed or enforced the law. Their duty to execute or enforce the law did not preclude them from providing emergency medical assistance to their arrestee. The immunity for enforcing and executing the law does not protect defendants.

*Del Tufo*, 650 A.2d at 1051. We see little to distinguish the facts in *Del Tufo* from the facts in this case.

Officers are under a duty to render emergency medical assistance to those in their custody. *See Del Tufo*, 650 A.2d at 1047; *Praet v. Sayreville*, 527 A.2d 486, 488 (N.J. Super. App. Div. 1987). In this case, the jury found that defendant detectives were negligent in carrying out that duty. Although New Jersey's good faith immunity offers protection to public employees from negligence while enforcing the law, *Del Tufo* forecloses defendants' reliance on section 59:3-3 in this case.[2] The officers' entry into

---

[2]We note some tension in the New Jersey cases under the New Jersey Tort Claims Act. A police officer engaged in enforcing the law is afforded immunity under N.J.S.A. 59:3-3 for negligent actions undertaken in good faith. Where his actions rise to the level of "willful misconduct"– which falls "somewhere on the continuum between simple negligence and the intentional infliction of harm"– good faith immunity can be defeated. *Alston v. City of Camden*, 773 A.2d 693, 702 (N.J. 2001). This is the general standard for
(continued...)

Rosario's home and their execution of Garcia's arrest warrant constituted law enforcement under section 59:3-3. Negligence arising from their failure to respond to Rosario's asthma attack and subsequent collapse, however, is not immunized by N.J.S.A. 59:3-3.

We recognize that New Jersey courts generally interpret immunity broadly. As the New Jersey Supreme Court has emphasized, "the approach of the Act is to broadly limit public entity liability," *Alston*, 773 A.2d at 697, and "to provide broad immunity to police officers acting in the scope of their duties." *Canico*, 676 A.2d at 1084. "As between the public policy favoring the compensation of injured parties and that favoring vigorous law enforcement, the Legislature has chosen enforcement of the law." *Id.* This policy preference, however– as articulated by both the legislature and the courts– does not relieve police officers of pre-existing duties. As in *Del Tufo*, the officers' failure to

---

[2](...continued)
acts undertaken during enforcement of the law. Where the acts giving rise to plaintiffs' negligence claim concern provision of emergency medical assistance, however, public employees will be held liable upon a showing of negligence, rather than willful misconduct. In this case, the jury found defendants negligent.

*Del Tufo*, therefore, appears to have created a medical assistance exception to the good faith immunity statute In effect, *Del Tufo* holds that police officers will be held to higher standards of conduct where enforcing the law includes managing a medical emergency. As noted, however, the facts of *Del Tufo* are virtually indistinguishable from those presented here, and *Del Tufo* makes clear that good faith immunity is not available to police officers accused of negligent provision of emergency medical assistance.

But application of *Del Tufo* here does not foreclose the Supreme Court of New Jersey from clarifying the applicability of immunity where there is significant overlap of the competing interests in the execution or the enforcement of the law and rendering medical assistance to subject of that law enforcement.

10

comply with their duty to provide emergency medical assistance during an arrest, as found by the jury here, is not negated by the law. N.J.S.A. 59:3-3.

The New Jersey courts' application of the Good Samaritan statute provides a useful analogy. In *Praet v. Borough of Sayreville*, the executrix of a deceased motorist's estate brought an action against police officers, alleging negligent failure to extricate decedent from the vehicle following his accident. 527 A.2d 486 (1987). The officers invoked the New Jersey Tort Claims Act's "good samaritan" immunity provision, arguing they could not be held liable for negligence in volunteering emergency assistance. *Id.* at 488. The court in *Praet*, however, found good samaritan immunity inapplicable and emphasized that police officers are not immunized from negligence in the performance of pre-existing duties:

> [The Good Samaritan Act] does not and never was intended to confer an immunity on one, who, whether a public employee or a private person, has a preexisting duty under the controlling circumstances to render emergency assistance. Thus, since the officers here, as defendants concede, were under a duty by virtue of their employment to render emergency assistance to victims of automobile accidents, they are as much liable for their negligence in so doing as they would be for the negligent performance of any other administrative or ministerial duty imposed upon them by their employment.

527 A.2d at 488. If police officers are not entitled to good samaritan immunity for negligence in providing emergency medical assistance that they are obligated to administer, we question whether they are entitled to good faith immunity for the same actions– or inaction.

11

Defendants urge the court to make a distinction between a complete failure to summon medical assistance, on the one hand, and negligence in the administration of partial medical assistance, on the other. In support of this distinction, they rely heavily upon the New Jersey Superior Court's opinion in *Aversano* v. *Palisades Interstate Parkway Commission*, 832 A.2d 914 (N.J. Super. App. Div. 2003) *aff'd* 851 A.2d 633 (N.J. 2004).[3] Specifically, they argue that the Superior Court's *Aversano* opinion compels a departure from *Del Tufo*.

As a preliminary matter, we note that the good faith immunity statute was not invoked in *Aversano*– rather, the officers in that case claimed absolute immunity under N.J.S.A. 59:4-8 (unimproved public property) and the Landowners' Liability Act, N.J.S.A. 2A:42A-3, and discretionary immunity under N.J.S.A. 59:3-2a and 59:2-3a. Considering the application of discretionary immunity to plaintiffs' claims of negligence in addressing a medical emergency, the court stated:

> There is precedent for finding police liable for negligent performance of rescue duties. On several occasions, we have found that police officers who negligently render rescue assistance are subject to liability under the TCA. . . . [T]he analogy to this case is clear. Had the Parkway police been out on other calls and unable to respond more quickly, immunity would apply. If the police had no means of obtaining medical treatment by someone trained to reach Andrew, immunity would apply. And if the police had concluded

---

[3]In *Aversano*, a teenage boy fell off a cliff. The police responding to the call determined that he was dead, and commenced a "recovery" effort. It was later determined that the boy was still alive. Although he eventually died, his parents claimed that had the police undertaken a "rescue" effort, rather than a "recovery" effort, he could have been saved.

12

> that the danger to medical rescue personnel was too great to risk rappelling down the cliff to Andrew's aid, immunity would apply to that discretionary decision. But none of those scenarios fit the facts here. The police had the ability (and the responsibility) to call the Closter Rescue Squad.
> \*     \*     \*
> Calling the rescue squad in a case like this, as the officers eventually did three hours later, is not a discretionary act that requires a high degree of judgment. In our view, it falls well within the bounds of a ministerial act. . . . As we noted above, *immunity would apply to a police officer's judgment undertaken in the course of a rescue effort, irrespective of whether that judgment was negligent.* But here, the supervising officer's alleged negligence was the very act of deciding *not* to rescue.

*Aversano*, 832 A.2d at 924-26 (emphasis added). Defendants argue this statement is determinative in the case before us. The distinction between discretionary immunity and good faith immunity in this instance is clear, however, and defendants' reliance upon *Aversano* is misplaced.

Discretionary decisions made during the course of a rescue effort are immunized under New Jersey law. N.J.S.A. 59:3-2. Defendants in this case do not claim they made a particular medical decision that was within their discretion to make. This is not a case in which police officers, faced with two emergencies and limited resources, exercised the judgment vested in them to determine that one situation presents a more compelling need than another. Rather, this is a case in which police officers, confronted with a medical emergency of the arrestee, stood by rather than providing oxygen or other assistance. Plaintiffs did not allege that the detectives made a decision which could be considered "discretionary"– rather, they allege that the detectives were willfully negligent in their provision of medical attention to Esteban Rosario.

13

In sum, defendants here are not entitled to good faith immunity for claims arising from their negligent provision of emergency medical services. The jury found them negligent. Because the statute's good faith immunity does not protect them from liability for negligent administration of emergency medical assistance, the jury's finding of negligence must stand.[4]

B.      Evidentiary Rulings

At trial, defendants attempted to introduce the arrest warrant of Osvaldo Garcia into evidence. The District Court excluded the warrant despite defendants' argument that it was relevant to their position that they were legitimately in Rosario's house. Defendants also attempted to introduce the testimony of Captain Blaeteler, which they argue would have provided an independent corroboration of the detectives' testimony regarding the reasons for their presence on 7th Street on the night in question. The District Court excluded this testimony.

We review the District Court's exclusion of evidence for abuse of discretion. *United States v. Tyler,* 281 F.3d 84, 98 (3d Cir. 2002). We believe the evidence should have been admitted, but that such error was harmless. Discretionary evidentiary rulings will give rise to reversible error only where "a substantial right of the party is affected."

_____

[4]Because we find defendants are not entitled to qualified immunity, we need not address their argument that "the false arrest claim against Loaces must be retried since it is impossible to ascertain what portion of the damages the jury attributed to the false arrest verdict as opposed to the more significant claims associated with the rendering of medical care."

*Becker v. ARCO Chem. Co.*, 207 F.3d 176, 180 (3d Cir. 2000) (citation omitted). Put differently, we will affirm a District Court's evidentiary ruling, even if it is erroneous, so long as it is "highly probable" that the error did not contribute to the verdict. *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 927-28 (3d Cir. 1985) (citing *Gov't of the Virgin Islands v. Toto*, 529 F.2d 278 (3d Cir. 1976)).

As the District Court repeatedly emphasized at trial, the legitimacy of the detectives' presence on 7th Street was never contested. Nor did plaintiffs contest that defendants had a valid arrest warrant for Osvaldo Garcia. Defendants' proffered evidence, therefore, may have been cumulative. Furthermore, because this evidence was offered to prove an undisputed fact, it is "highly probable" that its exclusion did not contribute to the verdict. Thus, any error was harmless.

C.    Prior Bad Acts

As part of their claim against the City for negligent retention, plaintiffs presented evidence of prior misconduct on the part of detectives Loaces and Gaston in the form of disciplinary records. Plaintiffs intended these disciplinary records to prove that the City knew or should have known of the detectives' professional shortcomings. The District Court admitted these records over defendants' objection that they were unduly prejudicial, and gave cautionary instructions to the jury.[5]

---

[5]The District Court cautioned the jury twice. First, during examination of defendant Loaces, the jury was informed as follows:

(continued...)

15

Plaintiffs' primary mode of proving that the City knew or should have known of the detectives' alleged professional shortcomings was through these disciplinary records. This evidence was relevant, and we see no basis for finding an abuse of discretion for refusing to exclude this evidence under Federal Rule of Evidence 403. S*ee United States v. Lopez*, 271 F.3d 472, 482 (3d Cir. 2001). As noted, District Judge gave a cautionary instruction during cross-examination of Loaces and also during final jury instructions. Although defendants contend the negligent retention claim was merely a back-door means of calling their character and credibility into question by presenting otherwise prohibited evidence of prior bad acts, we see no basis for deciding that the jury did not understand or

---

[5](...continued)

> I want to advise you that yesterday when we heard reference made by counsel to one of the witnesses about that witness' previous disciplinary problems with the police department such as, among other things, shooting paint pellets at pedestrians or civilian pedestrians, you heard that only for the reason that you may wish to evaluate that with regard to the claim by the plaintiffs that the City of Union City was negligent in retaining such a person as a police officer because of what the plaintiff claims are his earlier demonstration of dangerous characteristics such as, the plaintiffs will argue, insensitivity to injuring civilians. So you are to consider that in that context. Do you understand? This is unlike the circumstance where you would use a criminal conviction. This is all up to your discretion to impugn somebody's believability as a witness.

At the close of trial, the District Court again cautioned the jury with respect to use of the internal affairs report:

> You may only consider the earlier acts of defendants Loaces and Gaston in determining whether the municipal defendant negligently retained them. We are talking now about the earlier acts that were evidenced before you as to circumstances involving these 2 defendants Loaces and Gaston. Any questions?

16

would not adhere to the District Court's limiting instructions. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 383 (3d Cir. 2002).

D.     The Internal Affairs Report

At trial, plaintiffs introduced an Internal Affairs Report prepared by police Captain Pecora which set forth the findings and assessments of the police department's investigation into Rosario's death. The Report criticized certain decisions made by defendants during their execution of the arrest warrant. According to defendants, it also included hearsay recitals of witness statements obtained during the department's investigation.[6] The Internal Affairs Report was admitted over defendants' objections.

Defendants argue the report is irrelevant, after-the-fact, and should have been excluded as unduly prejudicial and potentially confusing.[7] We believe the report was

---

[6]The Internal Affairs Report states: "[i]t appears that Dets. Perez and Loaces erred in allowing a subject who they reasonably believed had an active arrest warrant to walk into a building where they could exert less control over his movements." At trial, plaintiffs' expert Francis Murphy testified that he agreed with the conclusion of the Report that defendants erred by not taking Garcia into custody before he entered the house. Police Chief Bareis also testified at trial that he agreed defendants committed a "tactical error" by permitting Garcia to enter the house.

[7]Defendants argue the substance of the report could have confused the jury because although the department's conclusion about "error" stemmed from a concern for the officers' safety, they believe the jury may have improperly extrapolated from the report that the "error" by the officers compelled a false arrest verdict. But the report is clear, as was the testimony of Chief Bareis, that the defendants' "error" referenced by the report and the testimony stemmed from the possibility that the officers permitted Garcia to leave their presence rather than arrest him immediately upon having identified him. Nowhere does the report suggest the officers erred in entering the home for any other reason than subjecting themselves to a greater risk of Garcia evading arrest and the report likely did

(continued...)

17

relevant to plaintiff's false arrest claim and properly admitted by the District Court. Moreover, even if its admission was erroneous, it is harmless. Admission of the report did not affect defendants' substantial rights, *see McQueeney*, 779 F.2d at 926, as we do not believe that– in light of the eyewitness testimony and other evidence concerning defendants' conduct– it had a significant impact upon the jury's false arrest verdict. Even without the report, there was substantial evidence to support the verdict.[8]

E.      Videotape Evidence

In their final assignment of error, defendants challenge the District Court's admission of a videotape depicting the scene on October 27, 1999. Defendants argue that the tape was poor quality, depicted only part of the scene, was not taken in real time, and was never properly authenticated. The District Court admitted the tape, reasoning that "it serves a purpose in our quest for truth in this matter" and it would not be "unfairly prejudicial" to defendants. The District Court also stated that it found the tape to be authenticated based upon identification of the individuals, location, and commentary presented by the film. In response to defendants' hearsay arguments, the District Court held that because the tape was admitted to prove ambiance, rather than for truth of the

---

[7](...continued)
not confuse the jury. Accordingly, we do not find the report to have been unduly prejudicial.

[8]It is unclear whether defendants properly raised a Rule 403 objection to the report at trial. But in any event, we conclude that admission of the report does not constitute reversible error in this case.

statements contained on the tape, there was no hearsay problem. Finally, the District Court– having viewed the tape twice– found it to be sufficiently audible and viewable. At trial, testimony established that the events depicted by the videotape represented the scene on October 27, 1999, at decedent's home.

The District Court found the tape was not unfairly prejudicial. The District Court did not abuse its discretion in admitting the tape into evidence. Substantial evidence was presented to support the authenticity of the tape and its content was relevant. Even if admission of the tape were erroneous, it is harmless. The tape was not introduced to prove the truth of any statements or the identity of any individuals, it was intended to establish the "ambiance" and set the "scene." Accordingly, the admission of the tape did not affect the substantial rights of the parties.

F.    Pecuniary Loss Award

Following trial, defendants moved to set aside the jury's cumulative award of $3 million in damages under the New Jersey Wrongful Death Act. The District Court granted their motion. We exercise plenary review. *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 664-65 (3d Cir. 2002) (citation omitted).

The New Jersey Wrongful Death Act provides as follows:

> In every action brought under the provisions of this chapter the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent.

19

N.J.S.A. 2A:31-5.  Damages under this statute are limited to the pecuniary value of plaintiffs' loss, and recovery for emotional loss is not permitted.  *Green v. Bittner*, 424 A.2d 210, 215 (N.J. 1980).  Furthermore, the loss of guidance, advice, counsel, and companionship must be assessed by reference to the marketplace value of such services.[9] *Id.*  More specifically, "[t]he type of advice and companionship compensable under the Act is the kind which may be purchased."  *Gangemi v. Nat'l Health Labs., Inc.*, 677 A.2d 1163, 1167 (N.J. Super. App. Div. 1996).

While expert testimony is not required to place a value on such services, New Jersey courts have found expert testimony helpful in providing the jury with guidance and in avoiding the potential for undue speculation.  *Brown v. Kennedy Mem'l Hosp.-Univ. Med. Ctr.*, 711 A.2d 1370, 1377 (N.J. Super. App. Div. 1998).  "[D]etailed information concerning family circumstances" will also be useful in establishing the pecuniary value of lost services.  *Green*, 424 A.2d at 218.

As the District Court noted, plaintiffs did not provide the jury with expert testimony concerning the value of their loss.  Nor did plaintiff provide the jury guidance as to the life expectancy of the decedent.  Plaintiffs testified as to the nature of their relationship with their father, their appreciation for his companionship and loving nature,

---

[9]We note that plaintiffs are not required to present specific evidence of companionship in order to establish that advice and guidance were exchanged among parents and children; the parent-child relationship itself suffices to establish that valuable services were in fact rendered by decedent.  *Rodriguez v. United States*, 823 F.2d 735, 749 (3d Cir. 1987) (citing *Green*, 424 A.2d at 217).

and the pain they suffered as a result of their loss.  They did not, however, present detailed evidence as to the pecuniary value of the guidance and advice of which they were deprived due to their father's death.  As the New Jersey Supreme Court explicitly stated, "[t]he loss of guidance, advice and counsel is . . . to be confined to its pecuniary element." *Id.* at 216.

Some damage awards in New Jersey have been upheld despite the absence of specific quantitative evidence.  *See, e.g., Rodriguez*, 823 F.2d at 750.  In *Rodriguez*, however, the jury was presented with detailed evidence concerning the services rendered by decedents in addition to expert testimony regarding their life expectancy.  In this case, by contrast, the jury was presented with no evidence enabling it to calculate rationally the value of plaintiffs' loss.

We find the District Court's extensive legal analysis on this issue sound.  In light of the evidence presented to the jury, the $3 million award could have been based upon nothing more than pure speculation.  We will affirm the judgment of the District Court vacating this award.

## G.     Amendment of the Complaint

Joanne Rosario claims the District Court erred by refusing to allow amendment of the caption so that she could be named as an individual plaintiff.  We review a ruling granting or denying leave to amend a complaint for abuse of discretion, its factual

21

conclusions for clear error, and its interpretation of the Federal Rules of Civil Procedure *de novo*. *Singletary v. Pa. Dept. of Corrs.*, 266 F.3d 186, 193 (3d Cir. 2001).

Joanne Rosario was originally named solely in her capacity as legal guardian to Esteban Rosario, Jr. She then sought to amend the complaint so that she could pursue an individual claim as well. The District Court stated as follows:

> In the third year of the life of this complaint and in the fourth week of the actual trial, plaintiff seeks to amend pleadings which had never indicated that, not in the caption but in the body, that Joanne Rosario would seek to bring a claim on her own behalf as she had every right to do individually. She was always represented in the pleadings as Joanne Rosario, the legal guardian of a mental incompetent Estaban Rosario, Jr. She maintained that status even to and during discovery period. Particularly when she was deposed and when asked what status Joanne Rosario was, her attorney at the time of discovery indicated and replied that she was there only as a legal guardian of Esteban Rosario, Jr.
>
> Consequently, defendants did not seek to depose her with regard to anything she might have said by way of being an individual claimant. Her deposition was limited only to that of her guardian status. Thereafter years went by, and I believe that deposition was in 2001, but we are now in the trial and the fourth week of trial and suddenly there is an attempt by the plaintiffs to assert that Joanne Rosario should be able to pursue what I consider the liberty claim that has recently been adopted by several circuits with regard to the 1983 claims.
>
> I concluded, based upon those cases and the fact of this case, that she comes too late to do so and I have given the reasons which I, by way of conclusion, I repeat again, that they are basically unfair to the interests of defendants who also have rights in this case. Defendants are prejudiced by not being able to depose her, being told just the opposite more than a year ago, that there has been no reason advanced by anyone as to why she was not pled as an individual plaintiff. But throughout the amended complaints, including first and second amended complaints, particularly in paragraph 44, she is continually listed and constantly listed as legal guardian.
>
> I think the interest of justice therefore demands in the interest of the court, the economy of the court, fairness to a jury that's being bombarded by a case now that has gone well beyond the representations of counsel and

22

the Court to wit in the interest of basic fairness that she will not be allowed to pursue, in effect, this stale claim.

[JA 871-72]. We find no abuse of discretion in the District Court's ruling.

IV.

For the foregoing reasons, we will affirm the judgment of the District Court.